[No. S004645. Crim. No. 24045. Jan. 23, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
GONZALO MARQUEZ MARQUEZ, Defendant and Appellant.

554

## COUNSEL

Eric S. Multhaup, under appointment by the Supreme Court, and Kathy M. Chavez for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White and George Williamson, Chief Assistant Attorneys General, Edward T.

Fogel, Jr., and Carol Wendelin Pollack, Assistant Attorneys General, William R. Weisman, Christine C. Franklin, Susan Lee Frierson and Sharlene A. Honnaka, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

PANELLI, J.—Defendant Gonzalo Marquez Marquez was convicted of the second degree murder of Angel Rodriguez (Pen. Code, § 187),[1] the first degree murder of Ascencion Hernandez with three special circumstances (multiple murder, murder during the commission of robbery, and murder during the commission of burglary) (§§ 187, 190.2, subd. (a)(3), 190.2, subd. (a)(17)(i), 190.2, subd. (a)(17)(vii)), first degree burglary (§ 459), and robbery of Hernandez (§ 211). The jury found that defendant personally intentionally inflicted great bodily injury as to each count (§ 1203.075) and that defendant personally used a firearm as to all counts except the Hernandez murder (§ 12022.5). The jury fixed the penalty at death; this appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

### GUILT PHASE FACTS

*Prosecution Case.*

1. *Murder of Angel Rodriguez.*

On December 31, 1979, El Monte police responded to a call and found the body of Angel Rodriguez lying on its back on the sidewalk. The victim's hands were in his pockets, and a hat was on his head. He had been shot in the head with a 9-millimeter handgun. Police questioned four Spanish-speaking individuals who lived nearby. They gave the police descriptions, names and nicknames of the two suspects. The witnesses also helped develop composite drawings of the suspects. An arrest warrant for defendant was obtained as a result of the information given. None of these witnesses could be located to testify at trial.

2. *Murder of Ascencion Hernandez.*

About 10:30 p. m. on March 15, 1981, Connie Hernandez was lying in her bed when she heard a voice in the living room saying "Chon, Chon," where her husband was watching a television program. Her husband's nickname was "Chon." She heard more voices, speaking Spanish, so she peeked out and saw two men pointing guns at her husband. Connie put on her robe, ran

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

into the living room and stood between her husband and the two men with the guns, facing the latter. At that point another man ran through the front door, put a knife to Connie's stomach, and told her to be quiet. While face-to-face with the gunmen, Connie was crying and screaming in Spanish, begging them not to do anything. She testified that defendant was one of the two gunmen and that he did most of the talking. Defendant was described as wearing a beanie covering his hair and ears; the other gunman wore no hat or mask; and the person holding the knife wore a beanie that covered his face and had holes for his eyes. The gunmen demanded money from Hernandez and threatened to kill him. When one of the babies started crying, Connie told the men in Spanish that she was going to her daughter's room to tell her to get medicine for the baby. The man with the knife followed her. She knocked on the door and, in English, told her daughter Sandra to go out the window and ask the neighbors to call the police because there were three men there who wanted to kill her husband. (The men did not understand English.) Connie returned to the living room and again positioned herself between the gunmen and her husband. Defendant was still demanding money. Finally, her husband said he would give them the money he had, took about $140 to $150 from his wallet, and threw it on the floor. Connie ran into the kitchen, heard shots, returned to the living room, and found her husband lying in blood.

Connie estimated that she looked at defendant for five minutes. She said his nose was pointed and that his eyes were big and round. There was adequate lighting; the overhead light was on in the kitchen, as was a lamp on top of the television.

Sandra de la Fuente testified that her mother's screaming awakened her; she opened the door and saw a masked man standing next to her mother, holding a knife on her. As her mother went toward the bathroom, Sandra walked a little way up the hallway and saw defendant pointing a gun at her stepfather. Her mother told her to go back to her room, lock the door, and go through a window to call the police. Sandra had a good look at defendant and heard him asking her stepfather for money.

Tina de la Fuente was awakened by her mother's screaming, went into the hallway, and saw defendant pointing a gun at her stepfather. She looked at him for about a minute and returned to her room. She did not see any other intruders. In particular, she remembered defendant's long nose.

Defendant was identified by each of the three eyewitnesses—Connie, Sandra, and Tina. Each separately identified defendant from a live lineup and at trial. Each testified that she recognized defendant as soon as he

entered the lineup area. Although Connie had been unable to identify defendant in a group of photographs shown her, she had told the officer that she could not make an identification from a photograph but thought that she would recognize the perpetrator in a live lineup. Neither Sandra nor Tina had been shown any photographs.

An autopsy revealed that Ascencion had been shot six times with a 9-millimeter handgun and three times with a .38-caliber automatic. The 9-millimeter handgun was not the same gun that was used in the killing of Angel Rodriguez.

### 3. *Defendant's Arrest and Confession.*

Defendant was arrested at his residence by El Monte police around 1 a.m. on December 12, 1981. Defendant's brother Amelio and defendant's girl-friend Martina Pereida were also arrested and placed in custody on charges unrelated to the murder. At a pretrial Evidence Code section 402 hearing defendant testified on cross-examination that at the time of his arrest he was in the shower, with no water running, and that he was wearing pants and shoes. At trial, however, he testified that he did not remember saying that and asserted that he remembered only that he was in the bathroom and was wearing pants.

On December 14, 1981, defendant was interviewed by Detective Johnston of the El Monte police, who was investigating the 1979 murder, Detective West of the Los Angeles Sheriff's Department, who was investigating the 1981 murder, and Detective Parrott of the El Monte police, who was interpreting for the other two. Detective Parrott had spoken Spanish at home since the age of 10 and had studied it in high school and college. Detective Parrott was familiar with the vernacular used by defendant and many other Spanish-speaking people in El Monte. Detective Parrott advised defendant of his *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) in Spanish from a Spanish-language rights card. Defendant appeared to understand what Detective Parrott said and his answers were responsive to her questions; he seemed relaxed and cheerful. Detective Parrott testified that no promises or threats were made to defendant or to any member of his family; defendant's answers appeared to have been freely and voluntarily given. Pursuant to departmental policy, the interview was not tape-recorded.

Detective Johnston and Detective West confirmed that Detective Parrott had read defendant his rights from a Spanish-language card, that no threats or promises had been made, and that defendant's statements appeared to have been freely and voluntarily made. Each requested Detective Parrott to

ask certain questions. Detective Parrott had little independent information about the crimes.

In his statement on December 14, 1981, defendant admitted complicity in both murders. When he was asked about a man who had died on December 31, 1979, defendant first said he was not in the country at that time. He then admitted shooting the man after being told that there were witnesses who could identify him. Defendant said his cousin Mario had been fighting with the victim on Merced Street in El Monte. Mario told defendant to shoot the victim, so defendant shot him in the head with a blue steel automatic weapon.

When asked about the death of Ascencion Hernandez on March 15, 1981, defendant said he was there but that he did not kill him. Defendant said he was there with Miguel Reyes (known as "La Gusia") and Jaime Polido (known as "Chu Cho" or "Chu Chi"). They lived in neighboring apartments, defendant with his brother-in-law, and Miguel and Jaime next door. About two days before the killing, Miguel told the other two about a man who had a "whole lot" of money and suggested that the three of them rob him. Miguel knew the man because their ranches in Mexico were close to one another.

Defendant described how Miguel drove him and Jaime in Miguel's yellow Mustang to "Chon's" house about 10 p.m. Miguel and Jaime had automatic weapons and defendant had a knife; Miguel was wearing a beanie that was pulled down to cover his face. When they went inside the house, defendant heard a woman talking in English and he thought there was a little girl there. The woman later came into the room. The victim was watching television. Jaime called the man "Chon" and told him to give them the money. The man said he did not have it there. Defendant said that Jaime and Miguel were doing the talking; he was standing by the door. Defendant did not see the shooting, but he heard three or four bullets. Defendant described Miguel as five feet eleven inches tall, heavy set, brown eyed, and having almost shoulder-length brown hair. He described Jaime as five feet two inches tall, chubby, with dark eyes and very dark, curly hair.

*Defense Case.*

Defendant testified at the pretrial Evidence Code section 402 hearing and at trial. He denied involvement in either the 1979 or 1981 shooting. He said he was living in his family home in El Pilon, Mexico, until he came to California in 1980. He did not remember specifically when he arrived. He returned to Mexico in 1980, and came back to California about September 1981. Defendant agreed that a Dr. Godinez had treated him in Buena Vista,

Mexico (a neighboring community) from March 13 through March 17, 1981, as Dr. Godinez had testified, but he did not know what was wrong with him or exactly when he was hospitalized. Defendant said he confessed because his wife was pregnant and in custody, and he was afraid that she would have a miscarriage. Defendant testified that Detective Parrott promised him his wife would be released if he told her what she wanted to hear. Defendant said that he answered "yes" to whatever Detective Parrott said and that he did not understand everything she said because he did not understand her Spanish.

Martina Pereida, defendant's girlfriend, testified that she went to Mexico with defendant in the last part of 1980 and stayed about one year. She testified that she remembered that defendant was in the hospital for four or five days in March 1981. She remembered the date because she had had a miscarriage then as a result of falling off a horse. Martina remembered being arrested and said she had difficulty understanding Detective Parrott's Spanish. She testified that she had been back in the United States about a month and a half when they were arrested on December 12, 1981. On cross-examination Martina testified that she returned to the United States with defendant. She acknowledged that a medical record indicated she had had a prenatal examination in California on August 27, 1981. When called as a rebuttal witness, Martina said that she knew a person by the name of "La Gusia" in El Pilon, Mexico.

Defendant's sister, Ana Maria Llamas, testified that she paid for defendant to come to the United States in the first part of 1980 and that he lived with her and her husband. Defendant left for Mexico with Martina in August, September, or October of 1980 and was gone for about a year. Defendant had been back in the United States about two to three months when he was arrested in December 1981. On cross-examination Ana Maria acknowledged that she had an uncle named Mario Marquez Marquez. When defendant wanted to return to the United States, he called Ana Maria collect and asked her to help him pass over the border. She did not, however, have any telephone records to verify the date of the call.

Dr. J. Jesus Godinez Gonzalez testified that he had a medical practice in Buena Vista, a neighboring community of El Pilon, and that he had been the family doctor for the Marquez family. Dr. Godinez treated defendant for a parasitic liver infection on March 13, 1981. He testified that defendant stayed at his clinic for four or five days, from March 13 to March 16 or 17, 1981. He remembered the incident because of the infrequency of seeing cases of parasitic liver disease and because he regularly gives patients a handwritten prescription with the date of consultation on it. Dr. Godinez kept

no medical records because his clients could not afford to pay him for the time that requires. Dr. Godinez had, however, at the request of defendant's parents, executed an affidavit stating that he had examined defendant on March 13, 1981, and had kept him in his clinic until March 17, 1981.

On cross-examination, Dr. Godinez stated that his affidavit giving the dates of treatment was based on the dates given in the prescription which defendant's father showed him in January 1982. He returned the prescription to defendant's father and had no copy of it. Dr. Godinez acknowledged that he had told the district attorney's investigator and Mexican police officers that he did not know the exact date on which he treated defendant.

## PENALTY PHASE FACTS

No evidence was presented at the penalty phase by either the prosecution or the defense.

## GUILT PHASE CONTENTIONS

1. *Denial of Motion to Suppress Evidence.*

■ Defendant contends that the trial court erred in denying his section 1538.5 motion to suppress evidence seized from his apartment at the time of his arrest and the subsequent confessions obtained as products of the arrest. He asserts that the arrest was invalid because it was effected in his residence without a valid arrest warrant. (*People* v. *Ramey* (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d 1333]; *Payton* v. *New York* (1980) 445 U.S. 573 [63 L.Ed.2d 639, 100 S.Ct. 1371].)

In *People* v. *Ramey, supra,* 16 Cal.3d 263, we held that the state and federal constitutional right of the people to be secure in their persons and houses against unreasonable seizure applies to arrests within the home, and that warrantless arrests within the home are per se unreasonable in the absence of exigent circumstances. The United States Supreme Court reached the same conclusion in *Payton* v. *New York, supra,* 445 U.S. 573, where it held that the Fourth Amendment right of the people to be secure in their houses prohibits police from making a warrantless and nonconsensual entry into a suspect's home to make a routine felony arrest. Any evidence seized pursuant to such a warrantless entry will be suppressed under *Ramey* and *Payton.*

At the hearing on the suppression motion the parties stipulated to the following: An arrest warrant was filed against defendant Gonzalo Marquez

Marquez on January 23, 1980 (A525456) on a felony complaint for the 1979 Rodriguez murder. The arrest warrant was erroneously recalled by the court on July 9, 1981.[2] The recall of the arrest warrant was not taken out of the automated warrants and wants system (AWWS), so that the arrest warrant was still listed in the system. On July 27, 1981, a bench warrant was issued for a Gonzalo Marquez (a different person) in the juvenile court of the Pomona branch court (J107274) and was still outstanding on December 12, 1981, when defendant was arrested.

Detective West of the sheriff's department testified that when they arrested defendant on December 12, 1981, they believed that there was an arrest warrant outstanding for defendant for the 1979 Rodriguez murder. Detective Parrott had so informed him. Moreover, they had an abstract of the arrest warrant when they made the arrest. Detective West had also seen a photocopy of the arrest warrant and the "murder book" for the Rodriguez murder, which contained copies of the police investigation report relating that defendant had been identified by an eyewitness to the Rodriguez murder.

The trial court denied the motion to suppress. It found that there was probable cause to arrest defendant independent of the erroneously recalled arrest warrant. The probable cause finding was based on the information known by Detective West and Detective Parrott from the crime reports in the "murder book" on the 1979 Rodriguez murder.

However, after hearing more evidence on the question of the Pomona arrest warrant, the court relied on its existence to validate the in-residence arrest. The court found that Detective Parrott had been informed by telephone that there was a Pomona arrest warrant outstanding: "I'm finding that her call to Pomona—and I'm finding that she did make a call and that she did receive information that there was a warrant; and I'm finding that that is in fact sufficient to arrest the defendant in his residence, the fact that she had knowledge that there was a warrant in full force and effect."

Defendant disputes the trial court's finding of probable cause, contending that the probable cause generated by the 1979 investigation was vitiated in 1981 by the arrest of another Gonzalo Marquez who met the general description and by the absence of the alleged eyewitness who identified defendant. Defendant argues that the erroneous arrest of another Gonzalo Marquez demonstrates that the description in the warrant was too general

---

[2]The arrest warrant was recalled when a different Gonzalo Marquez was mistakenly arrested on it. He was then mistakenly released, and a bench warrant was issued for him in the Juvenile Court of the Pomona Branch of the Los Angeles County Superior Court.

and that the testimony of the alleged eyewitness was therefore necessary to identify the correct Gonzalo Marquez. We disagree. The similarity in description between the two Gonzalo Marquez's does not extinguish the probable cause that existed for the arrest of defendant. The probable cause consisted of more than just the warrant. The police had reviewed the "murder book," the composite drawing developed with the help of the three eyewitnesses to the murder, and the copies of the police investigation report relating the identifications by the eyewitnesses.

Defendant further argues that the trial court erred in relying on the Pomona arrest warrant because that warrant related to a different Gonzalo Marquez. The record indicates that Detective Parrott was not aware of the mistaken identity problem and thus assumed that the warrant was for defendant. Defendant notes that *People* v. *Ramirez* (1983) 34 Cal.3d 541 [194 Cal.Rptr. 454, 668 P.2d 761] explicitly states that law enforcement oversight or carelessness in failing to remove a defunct warrant from the computer system may not be used to legitimate an arrest purportedly made in reliance on the recalled warrant. Accordingly, he argues that since the arrest was invalid, all evidence obtained as a result of the arrest must be suppressed. We disagree.

The situation here differs from that in *Ramirez, supra,* 34 Cal.3d 541. Unlike *Ramirez,* the police in this case had probable cause to arrest defendant independent of the arrest warrant. The arrest warrant served only to legitimate the arrest of defendant in his residence. The United States Supreme Court considered a similar situation in *New York* v. *Harris* (1990) 495 U.S. 14 [109 L.Ed.2d 13, 110 S.Ct. 1640], where police, without a warrant but with probable cause, arrested Harris in his apartment. The court noted that the purpose of the warrant requirement for an arrest in the home is to protect the home. Thus anything incriminating that the police gathered from arresting Harris in his home, rather than elsewhere, must be suppressed. The court refused to require suppression of statements made at the police station, explaining: "Nothing in the reasoning of that case [*Payton* v. *New York, supra,* 445 U.S. 573] suggests that an arrest in a home without a warrant but with probable cause somehow renders unlawful continued custody of the suspect once he is removed from the house. There could be no valid claim here that Harris was immune from prosecution because his person was the fruit of an illegal arrest. [Citation.] Nor is there any claim that the warrantless arrest required the police to release Harris or that Harris could not be immediately rearrested if momentarily released. Because the officers had probable cause to arrest Harris for a crime, Harris was not unlawfully in custody when he was removed to the station house, given Miranda warnings and allowed to talk. For Fourth Amendment purposes, the legal issue is the

same as it would be had the police arrested Harris on his door step, illegally entered his home to search for evidence, and later interrogated Harris at the station house. Similarly, if the police had made a warrantless entry into Harris' home, not found him there, but arrested him on the street when he returned, a later statement made by him after proper warnings would no doubt be admissible." (*Id.* at p. 18 [109 L.Ed.2d at pp. 20-21].)

The decision in *New York* v. *Harris, supra,* 495 U.S. 14 [109 L.Ed.2d 13] is not necessarily determinative in this case because the crimes here were committed before the passage of Proposition 8. (See *People* v. *Smith* (1983) 34 Cal.3d 251, 258 [193 Cal.Rptr. 692, 667 P.2d 149].) Thus, we must determine whether the confession nevertheless should be suppressed under our state Constitution. For the reasons stated in *New York* v. *Harris, supra,* we are persuaded that the California Constitution does not require that the confession be suppressed solely for violation of the rule set forth in *People* v. *Ramey, supra,* 16 Cal.3d 263. Moreover, the policy concerns of *Ramey* were satisfied, in any event, since there had been review by a neutral magistrate at the time the arrest warrant was originally issued. (*Id.* at p. 275.)

Accordingly, we conclude that the lack of an arrest warrant does not invalidate defendant's arrest or require suppression of statements he made at the police station. It would require suppression solely of evidence obtained from searching the home at the time of the arrest. The only evidence so obtained consisted of 40 balloons of heroin, which were not admitted at trial, and the record that indicated a prenatal examination for Martina Pereida had occurred on August 27, 1981, which was admitted at trial.

Thus, we need not decide whether the Pomona warrant could legitimate the in-residence arrest of defendant because the only evidence that would be affected by such a ruling is the record of Martina's prenatal examination. Even assuming that such evidence should have been suppressed, we have no difficulty concluding that any error in admitting the record was harmless beyond a reasonable doubt.

2. *Denial of Motion to Suppress Statements.*

 Defendant brought a motion pursuant to Evidence Code section 402 to suppress the statements he made at the police station on the ground that the *Miranda* warnings were constitutionally defective, that his waiver was not knowing and voluntary, and that the statements were involuntarily given in exchange for the release of his then pregnant girlfriend.

Detective Parrott testified that she advised defendant of his *Miranda* rights by reading from a Spanish-language card. Her ability to speak Spanish and

to advise defendant of his *Miranda* rights was the subject of two Evidence Code section 402 hearings—one pretrial and the other during trial. The court and counsel indicated their satisfaction with Detective Parrott's ability to communicate in Spanish. Detective Parrott testified that defendant was relaxed, appeared to understand the advisements, and responded appropriately.

A court interpreter examined the text of the *Miranda* rights given to defendant. It was his opinion that some of the words might have been confusing.

Defendant testified in his own behalf at the Evidence Code section 402 hearing. He remembered talking to Detective Parrott at the police station, but he did not remember if she had informed him that he had certain rights or if she had read from a card. The only time he remembered discussing a lawyer was when they finished talking. Defendant said that he talked to Detective Parrott because she told him that his wife and brother would get out of jail and that he would spend only one year in jail if he talked to her. Defendant said all he had to do was say "si" because Detective Parrott gave the information.

Detective Parrott testified again and denied that any promises or threats had been made to defendant. She specifically denied telling defendant that if he talked to her then he would serve only one year in jail. Detective Parrott said she told defendant that his wife was fine and that she was being held until they determined who had been in possession of the drugs found in the apartment.

After performing its own questioning of defendant regarding his understanding of the Spanish admonitions and hearing argument by both sides, the court denied the motion to suppress the statements. It found that Detective Parrott had read defendant his rights in Spanish, that she asked him in Spanish whether or not he understood those rights, and that defendant stated he did understand those rights. The court further found that defendant understood the rights that were read to him and that he gave up his rights freely and voluntarily.

The record supports the trial court's findings. Defendant's argument to the contrary is premised on a one-sided view of the evidence. ■ When the testimony is conflicting, we accept the version most favorable to the People to the extent that it is supported by the record. (*People* v. *Duck Wong* (1976) 18 Cal.3d 178, 187 [133 Cal.Rptr. 511, 555 P.2d 297].) ■ The trial court resolved the conflicts in testimony against defendant, and its resolution was entirely reasonable.

■ Defendant also contends that the trial court erred in failing to exclude his statement on due process grounds because the police officer acting as interpreter acknowledged a lack of fluency in Spanish, the police interpreter was also an investigating officer and an interested party, and the statements were not tape-recorded.

Defendant mischaracterizes the record as to Detective Parrott's fluency in Spanish. She testified that she was fluent as to everyday matters and the Spanish spoken in the area defendant is from, but that her Spanish might be lacking when it came to an intellectual discussion. Defendant's characterization of Detective Parrott as an interested party and improper interpreter is premised on authorities and standards relating to court interpreters at trial. Detective Parrott was not acting as a court interpreter; she functioned as a facilitator for the police investigation. Thus the standards for court interpreters have no application.

Finally, the argument for excluding statements unless they are tape-recorded has been made and rejected before. (See *People* v. *Marshall* (1990) 50 Cal.3d 907, 925 [269 Cal.Rptr. 269, 790 P.2d 676].) We decline to reexamine the point.

### 3. *Admission of Lineup and In-court Identification Evidence.*

■ Defendant contends that the court erred in denying his pretrial motion to suppress evidence of the identification made by Connie Hernandez and her daughters at a lineup. Defendant had argued for suppression on the ground that the lineup was unduly suggestive because his inability to speak English made him stand out. The court viewed a videotape of the lineup and heard testimony from defendant and a court interpreter. Defendant testified that he understood none of the directions given in English and only some of the directions that were given in Spanish. He simply followed the example of the other participants. The interpreter said that some of the Spanish words used were unusual and characterized the person conducting the lineup as a "very poor communicator" in Spanish.

In denying the motion, the court observed that defendant did appear a little confused when following the first few commands but that he thereafter appeared to follow the commands that were given. The court also noted that some of the lineup participants moved with the English instruction and others with the Spanish instruction even though all were told on several occasions not to move until the commands were made in both English and Spanish. The court further observed that all six participants were Hispanic males of medium height and slender build, but that their facial features were

distinctive. In concluding that the lineup was not unnecessarily suggestive, the court expressly noted that it had taken into consideration the fact that Connie Hernandez believed the perpetrator did not speak English.

The record supports the trial court's finding. We have reviewed the videotape of the lineup and concur with the trial court's assessment of it. Notwithstanding defendant's difficulty in understanding the directions, he did not stand out.

### 4. *Motion to Sever Counts.*

■ Defendant contends that the trial court erred in denying his motion to sever the two unrelated murder charges. Defendant had argued for severance on the ground that the differences in evidence relating to the separate murders carried a risk that the greater evidence as to the Hernandez murder would have a spillover effect as to the Rodriguez murder. The court denied severance after concluding that there was not such a disparity in evidence that there would be prejudice in trying the two counts together.

Section 954 provides in pertinent part: "An accusatory pleading may charge two or more different offenses . . . of the same class of crimes or offenses, under separate counts . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."

The statutory requirements for joinder were met here because the two murders were of the same class. Since the requirements for joinder were satisfied, defendant can predicate error only on a clear showing of potential prejudice. (*Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 447 [204 Cal.Rptr. 700, 683 P.2d 699].) The burden was, of course, on defendant to show prejudice. (*People* v. *Bean* (1988) 46 Cal.3d 919, 938-939 [251 Cal.Rptr. 467, 760 P.2d 996].)

Defendant bases his argument for prejudice primarily on the absence of cross-admissibility of the two offenses. Even if defendant is correct on this point, it is now clear, however, that cross-admissibility is not the sine qua non of joint trials. (*People* v. *Mason* (1991) 52 Cal.3d 909, 934 [277 Cal.Rptr. 166, 802 P.2d 950]; *Frank* v. *Superior Court* (1989) 48 Cal.3d 632, 641 [257 Cal.Rptr. 550, 770 P.2d 1119]; *People* v. *Poggi* (1988) 45 Cal.3d 306, 321 [246 Cal.Rptr. 886, 753 P.2d 1082].) "While we have held that cross-admissibility ordinarily dispels any inference of prejudice, we have

never held that the absence of cross-admissibility, by itself, sufficed to demonstrate prejudice." (*People* v. *Mason, supra,* 52 Cal.3d at p. 934.)

Defendant also asserts that the joinder of the two murders was inflammatory and tended to bolster the evidentiary weaknesses in the two crimes. The argument is unavailing. We have never treated two relatively similar crimes such as these as carrying an inflammatory effect when joined. The murders here were straightforward, and there was not a great disparity in the strength of the evidence as to each. Indeed, defendant confessed to both crimes during the same interrogation session. We have cautioned against the joining of an inflammatory offense such as child molestation with a murder offense (see *Williams* v. *Superior Court, supra,* 36 Cal.3d at p. 452) and the joining of two murders that would become capital offenses solely by virtue of being tried together. (*Id.* at p. 454.) This is not such a case.

In summary, defendant did not carry his burden to show prejudice. (*People* v. *Mason, supra,* 52 Cal.3d at p. 935.) Thus, the trial court did not abuse its discretion by denying the motion to sever the two murder charges.

5. *Testimony by Defense Counsel.*

Defendant contends the trial court prejudicially erred when it permitted defense counsel de la Pena to testify. De la Pena decided that it was necessary for him to testify in surrebuttal after district attorney investigator Gonzalez testified in rebuttal regarding his 1983 interview with Dr. Godinez. Investigator Gonzalez testified that Dr. Godinez had told him that defendant's parents had brought in a prescription about a year after defendant's treatment, that he had issued an affidavit based on the prescription, and that the parents had kept both the affidavit and prescription. Investigator Gonzalez also testified that Dr. Godinez had said he was not shown documents by anyone and that the only person who had talked to him was a private investigator. The latter testimony conflicted with that of defense investigator Daniel Mendoza, who had stated that he had shown Dr. Godinez the affidavit regarding his treatment of defendant.

De la Pena explained outside the presence of the jury that he would need to testify in surrebuttal to relate his conversation with Dr. Godinez—that is, that he and his investigator were both present and showed Dr. Godinez the affidavit. The trial court explained to defendant that although de la Pena would be unavailable to advise defendant during his testimony, cocounsel Brewer would still be available to advise defendant. Defendant indicated his understanding and agreement with the plan for de la Pena to testify. As a precaution the court advised defendant of his attorney-client privilege and

obtained a waiver from defendant to the extent that de la Pena disclosed any confidential communications.

De la Pena testified that he and investigator Mendoza went to Mexico in January 1983. They attempted to find records of defendant's birth, went to El Pilon to talk with defendant's family, and went to Buena Vista to talk to Dr. Godinez. They showed Dr. Godinez the affidavit that he had earlier given to defendant's parents. The affidavit refreshed Dr. Godinez's recollection as to the dates of defendant's treatment.

De la Pena acknowledged on cross-examination that he could not find, and had never seen, the prescription, and that defendant's parents had said that they had some flooding and much was destroyed. De la Pena also explained that he had checked with local police in the hope of discovering proof of defendant's age. The prosecutor asked if defendant was known by "El Chile" in Mexico, and de la Pena responded that an uncle had said defendant was called "El Chile" when he was little.

In arguing that the court erred in permitting counsel to testify, defendant has cited no authority directly supportive of his position. The situation here is significantly different from that in *People* v. *Rodriguez* (1981) 115 Cal.App.3d 1018 [171 Cal.Rptr. 798], where defense counsel was called as a witness by the prosecution. Moreover, a trial court may not deny the defendant the right to present impeaching evidence through the testimony of his counsel, notwithstanding the provisions relating to testimony by counsel in the Rules of Professional Conduct. (See *People* v. *Goldstein* (1982) 130 Cal.App.3d 1024, 1030-1032 [182 Cal.Rptr. 207].)

██ Defendant also charges ineffectiveness of counsel as a result of counsel's decision to testify. Defendant argues that the benefits of such testimony were negligible and that the prejudice that ensued was substantial. Defendant asserts that counsel completely sabotaged his defense by allowing inadmissible testimony out of counsel's own mouth that defendant had been called "El Chile" as a child, whereas defendant, in his own testimony, had denied that he was called "El Chile."

Defendant made a number of claims of ineffectiveness of trial counsel in his petition for writ of habeas corpus. We discuss the matter at length in a companion opinion that is being filed today. ██ As we note in that opinion, there are two components to a claim by a defendant that his counsel's assistance was so defective as to require reversal of a conviction or death sentence. (*In re Fields* (1990) 51 Cal.3d 1063, 1069 [275 Cal.Rptr. 384, 800 P.2d 862]; *Strickland* v. *Washington* (1984) 466 U.S. 668, 687 [80

L.Ed.2d 674, 693, 104 S.Ct. 2052].) The burden is on the defendant to show (1) that counsel's representation was inadequate, and (2) that there is a reasonable probability that the result would have been more favorable absent counsel's deficiencies. (*Strickland* v. *Washington, supra*, 466 U.S. at pp. 687, 693-694 [80 L.Ed.2d at pp. 693, 697-699]; accord *People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland* v. *Washington, supra*, 466 U.S. at p. 694 [80 L.Ed.2d at pp. 697-698].)

■■■ We need not determine whether counsel's actions were deficient because, in our view, defendant has failed to show prejudice under the *Strickland* v. *Washington* standard (*supra*, 466 U.S. 668). Based on our review of the evidence presented at trial, we are convinced that there is no reasonable probability that the jury would have reached a different result had it not heard counsel's testimony that defendant had been called "El Chile" as a youngster or any other references to the perpetrator being known as "El Chile." The issue of whether or not defendant was known as "El Chile" was of minor consequence at trial in light of the evidence of defendant's detailed confession to both murders and his identification by three eyewitnesses to the 1981 murder. We are not persuaded by defendant's argument that the eyewitness testimony should be accorded little weight. Each separately identified defendant from a live lineup and at trial. Each had sufficient opportunity to observe defendant and had strong recollection of his appearance. Moreover, each testified that she recognized defendant as soon as he entered the live lineup area. The fact that Connie Hernandez did not identify defendant's photo from a group of photos that had been shown to her does not diminish the strength of her identification testimony. Though defendant recanted his confession in his trial testimony, his testimony was marked by frequent failures to recall or to understand in response to questions on cross-examination.

### 6. *Alleged Prosecutorial Misconduct.*

■■■ Defendant contends that the prosecutor committed misconduct during closing argument by: (1) referring to "heavy, heavy smokescreen that has been laid down [by the defense] to hide the truth from you"; (2) referring to defense witnesses as "myna birds, programmed to say certain things and nothing more"; (3) accusing Dr. Godinez of perjuring himself and falsifying evidence regarding the dates he treated defendant; and (4) implying that he had personal knowledge of other incriminating evidence that was not admitted at trial.

We begin by noting that defendant failed to object at trial to any of these references. ■■■ Where, as here, the defendant failed to object below, the

initial question to be decided is whether a timely objection and admonition would have cured the harm. If it would, the contention must be rejected; if it would not, then and only then must we reach the issue of whether the harm resulted in a miscarriage of justice. (*People* v. *Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].)

 In this case, defendant's failure to object bars review since any harm as to each of the cited instances could have been cured by a timely objection and admonition. We further note, however, that only one of the cited instances could possibly have constituted misconduct in any event. The analogy to a smokescreen was proper argument against the jury's acceptance of the defense presented. It was made in the context of reminding the jury about the strength of the prosecution evidence presented on the Hernandez murder. The reference to "myna birds" was made in the context of noting the deficiencies in the defense witnesses' testimony on cross-examination.[3] (See *People* v. *Martin* (1983) 150 Cal.App.3d 148, 166 [197 Cal.Rptr. 655] [prosecutor likened defense witness to puppet on string].) The prosecutor was entitled to argue the flaws in Dr. Godinez's testimony. Although the prosecutor's reference to a tape recording of a witness's statement as not exonerating defendant was arguably improper since the tape recording had not been admitted into evidence, any ensuing prejudice readily could have been cured by a timely objection and admonition. (See *People* v. *Green*, *supra*, 27 Cal.3d at p. 34.)

### 7. *Jury Selection.*

Defendant contends that he was denied his right to a jury drawn from a fair cross-section of the community by the exclusion from the guilt phase jury of persons who would automatically vote against the death penalty. The contention has been decided adversely to defendant's position and we are not inclined to reconsider it. (See *Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758]; *People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1254 [278 Cal.Rptr. 640, 805 P.2d 899].)

Defendant also contends that he was denied due process and the right to a fair and impartial jury by the exclusion of resident aliens from the jury venire. Again, the contention has been decided adversely to defendant's position and no useful purpose would be served by repeating that discussion. (See *People* v. *Karis* (1988) 46 Cal.3d 612, 631-634 [250 Cal.Rptr. 659, 758 P.2d 1189].)

---

[3]The prosecutor stated, for example: "The other smoke that's been laid down—you observed the defendant, Mrs. Llamas, his sister, and his common-law wife. [¶] In fact, myna birds say only that which they've been programmed to say, and everything else is stonewalled. I don't remember. I don't understand."
This was fair comment on the way these witnesses testified.

### 8. *Instruction on Circumstantial Evidence.*

 Defendant contends the trial court erred in failing to instruct sua sponte on the sufficiency of circumstantial evidence as set forth in CALJIC No. 2.01. The instruction must be given sua sponte when the prosecution substantially relies on circumstantial evidence to prove guilt. (*People v. Wiley* (1976) 18 Cal.3d 162, 174 [133 Cal.Rptr. 135, 554 P.2d 881]; *People v. Yrigoyen* (1955) 45 Cal.2d 46, 49 [286 P.2d 1].)

The court indicated it was not giving CALJIC No. 2.01 because the People's case rested substantially on direct evidence. Defense counsel agreed with the court's assessment and the decision not to give CALJIC No. 2.01. The record supports the court's determination. The situation is similar to that in *People v. Wiley, supra,* 18 Cal.3d at pages 174-176, where we upheld the trial court's failure to give CALJIC No. 2.01 on the ground that the People had not substantially relied on circumstantial evidence and that the circumstantial evidence in the case was not equally consistent with a rational conclusion that the defendant was innocent. Here the circumstantial evidence related only to whether defendant was the one who actually fired the shots at Hernandez. That point alone did not constitute substantial reliance. Accordingly the court did not err in failing to give CALJIC No. 2.01.

### 9. *Midtrial Motion to Suppress.*

 Defendant contends that the trial court erroneously denied the motion to suppress evidence he made during the course of the trial. The evidence he sought to suppress was the photograph taken of him during a traffic stop and the lineup identifications of him. The trial court allowed the motion after defendant asserted that the grounds for the motion arose during the testimony of Detective Parrott and were unknown to him before trial.

Detective Parrott testified that she asked for a marked police car to stop a car she saw driving away from defendant's residence because she thought that a person in the car resembled the composite drawing of the killer of Angel Rodriguez. Her purpose for the stop was to take a photograph of the person to aid in the murder investigation. The officer who stopped defendant's car testified that he was told via radio broadcast that the occupants of the car were involved in an investigation and that he should stop their car if he saw a Vehicle Code violation. The officer stopped the car for having a bald tire in violation of the Vehicle Code. Detective Parrott arrived, sought and obtained defendant's permission to photograph him, and did so while the officer was writing a citation for the bald tire and for failure to produce a driver's license. Only five to ten minutes elapsed from the time defendant's car was stopped until Detective Parrott took defendant's photograph and left.

Defendant argued that the stop was invalid because it was based on a pretext. The trial court denied the motion on the ground that there was probable cause to arrest and to stop the vehicle to issue a citation.

Defendant contends that the stop was unlawful because it was based on a pretext. Defendant's argument appears to be premised on the proposition that there was not sufficient cause to stop defendant absent the traffic violation. However, that is not the situation here. We are not faced with a situation in which the traffic stop is used as a pretext for investigation of other crimes for which there were not grounds to stop. (See *Cummins* v. *United States* (1991) __ U.S. __ [116 L.Ed.2d 448, 112 S.Ct. 428], dis. opn. of White, J., on denial of cert.)

In the present case, Detective Parrott wanted to stop defendant because he resembled the composite drawing of the person who killed Angel Rodriguez. She wanted to investigate whether he was in fact that person. Thus, the facts known to Detective Parrott clearly justified a temporary detention for investigation, which is all she wanted. (See *In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957].) There was no impropriety in such investigation or in asking defendant for his permission to be photographed. Defendant gave his consent, and the photograph was taken. The entire encounter lasted no more than five to ten minutes.

We conclude that the trial court properly denied the motion to suppress. Although our reasoning differs somewhat from the trial court's reasoning, it is settled that the trial court's ruling must be upheld if there is any basis in the record to sustain it. (See *People* v. *Braeseke* (1979) 25 Cal.3d 691, 701 [159 Cal.Rptr. 684, 602 P.2d 384].)

10. *Instruction on Juror Note-taking.*

 Relying on *People* v. *Whitt* (1984) 36 Cal.3d 724, 746-747 [205 Cal.Rptr. 810, 685 P.2d 1161], defendant contends that the trial court erred in failing to instruct sua sponte on the dangers of note-taking. Although we suggested in *Whitt* that the better practice is to give such an instruction, we have since made it clear that a trial court is not required to give the instruction. (*People* v. *Morris* (1991) 53 Cal.3d 152, 214-215 [279 Cal.Rptr. 720, 807 P.2d 949]; *People* v. *Harris* (1989) 47 Cal.3d 1047, 1095-1096 [255 Cal.Rptr. 352, 767 P.2d 619].)

11. *Defendant's Age.*

Defendant contends that the special circumstance findings must be set aside because of constitutional defects in the allocation of the burden of

proof of age, as well as the trial court's failure to instruct the jury on age as a material issue. Section 190.5 provided at the time of trial: "Notwithstanding any other provision of law, the death penalty shall not be imposed upon any person who is under the age of 18 at the time of the commission of the crime. The burden of proof as to the age of such person shall be upon the defendant."

 At the time set for the preliminary hearing in this case, defendant raised the question of his age by moving for a fitness hearing. The court agreed that there was a question as to defendant's age. Apparently acting pursuant to Welfare and Institutions Code section 604, the court suspended proceedings and referred the matter to the superior court, juvenile division, for certification as to both defendant's age and his fitness to be tried as an adult.[4] Although the parties and court referred to the proceeding as a "fitness hearing," they conceded that the only issue was defendant's age. The proceeding, however, does not appear to have been a true fitness hearing since the formalities of a fitness hearing, such as obtaining a probation report, were not followed. (See Welf. & Inst. Code, § 707.) If the proceeding had been a true fitness hearing under section 707 of the Welfare and Institutions Code, we would be precluded from reviewing the issue on appeal since fitness determinations are reviewable only by extraordinary writ. (See People v. Chi Ko Wong (1976) 18 Cal.3d 698, 714 [135 Cal.Rptr. 392, 557 P.2d 976].)

At the hearing four of defendant's relatives testified that his birth date was December 31, 1964, which would have made him under the age of 18 at the time of the crimes. One cousin testified that he was three days older than defendant, whose birthday was December 31, 1964, but that he did not know the birth date of another cousin he had seen only four days before his testimony. Defendant's sister testified to the December 31, 1964, birth date, but she admitted on cross-examination that she did not know the birth dates of any of her seven other brothers who lived in Mexico. She had asked her mother to obtain a birth certificate for defendant, which was done and submitted to the court. A court interpreter translated the submitted document. It said that a judge of the civil registry in the City of Los Reyes, State of Michoacan de Campo, Mexico, certified that on February 18, 1982, there appeared before him Maria De La Luz Marquez Eheredia who stated that Gonzalo Marquez Marquez was born on December 31, 1964, in El Pilon de Buena Vista, Mexico.

Detective Parrott testified for the People that while defendant was in custody after his arrest on December 12, 1981, he stated about three different

[4]Under Welfare and Institutions Code section 604, the court itself should have suspended proceedings, determined defendant's age, and remanded to the juvenile court only if it found defendant to be under the age of 18 at the time of the offense.

times that his birth date was January 1, 1961. She requested a birth or baptismal certificate from the Archbishop of the Catholic Church in Chihuahua, Mexico. The response was that church authorities had no records on defendant.

The court found defendant's birth date to be January 1, 1961, and rejected defendant's evidence as being noncredible. The court observed that defendant looked much older than his cousin who claimed to be three days older than defendant and that none of the witnesses had actual knowledge of defendant's birth date. The court found defendant's documentation unreliable because the date of birth stated in it was based on what defendant and his mother had told the official.

Defendant makes a number of challenges to the constitutionality of section 190.5's allocation of the burden of proof. ▆▆▆ He first contends that it violates the state and federal equal protection guarantees to place the burden of proof of age on the defendant in a capital case while every other criminal penalty enhancement provision places the burden on the state to show attainment of a particular age. He cites narcotics and sex offense statutes that provide for a greater punishment when the victim or the perpetrator is under or over a certain age. (E.g., §§ 286, 288a; Health & Saf. Code, §§ 11353, 11354.) The claim fails, however, because the defendants are not similarly situated. Age is an element of the offense in the statutes cited by defendant but it is not in section 190.5. (See *People* v. *Montalvo* (1971) 4 Cal.3d 328, 333, fn. 3 [93 Cal.Rptr. 581, 482 P.2d 205, 49 A.L.R.3d 518].)

Defendant next contends that section 190.5 violates due process because it establishes a presumption that any capital defendant has attained the age of 18. Again, however, his argument is premised on viewing the age requirement in section 190.5 as an element of the offense or as material to the determination of guilt, which it is not. (See *People* v. *Ellis* (1929) 206 Cal. 353, 357-358 [274 P. 353].)

▆▆▆ Defendant asserts that section 190.5 is violative of the federal and state prohibitions against cruel and/or unusual punishment where, as here, conventional proof of age is impossible. He also contends that the trial court erred in failing to instruct the jury on defendant's age because it was a material issue. These contentions require discussion of the nature of the age requirement set forth in section 190.5. Defendant would have us characterize it as a material issue or element of the offense. Predecessor statutes to

section 190.5 have, since 1921, exempted persons under the age of 18 from the death penalty and placed the burden of proof of age on the defendant. (See *People* v. *Spears* (1983) 33 Cal.3d 279, 281 [188 Cal.Rptr. 454, 655 P.2d 1289]; *People* v. *Ellis, supra,* 206 Cal. at p. 356.) As early as 1929 we rejected a challenge to this provision, noting that the provision is analogous to the question of insanity and that it is not strictly accurate to denominate the plea of insanity a "defense." "More correctly it is a special plea to the effect that, assuming the homicide to have resulted from the act of the defendant, he is not amenable to punishment under the law. So, too, assuming the commission of the crime by the defendant, the plea of under-age does not go to the question of guilt but only to the question of the amenability of the defendant to suffer the death penalty." (*People* v. *Ellis, supra,* 206 Cal. at pp. 357-358.)

A capital defendant's age is like mental competence to stand trial, in that it is a prerequisite to a valid judgment and sentence. (See *People* v. *Davis* (1981) 29 Cal.3d 814, 827, fn. 5 [176 Cal.Rptr. 521, 633 P.2d 186].) It is not, however, an element of the offense and is not determined during the fact-finding on guilt.

 Turning to the question of whether the court erred in failing to instruct the jury on defendant's age, we note that nothing in section 190.5 specifies the procedure by which a defendant's age is to be determined. In the present case, defendant raised the question of his age prior to trial. The matter was fully litigated then and was not thereafter raised at trial. It is settled that a court must instruct sua sponte on general principles of law that are closely and openly connected with the facts of the case. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913].) The duty to instruct sua sponte on general principles encompasses the duty to instruct on defenses that are raised by the evidence and on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present. (*Id.* at pp. 715-716.) The occasional and isolated references to defendant's age during the guilt phase were not, in our view, sufficient to invoke a sua sponte duty on the trial court to instruct the jury on the issue.

We find nothing in *People* v. *Ellis, supra,* 206 Cal. 853, that requires a contrary result. The defendant in *Ellis* was convicted of first degree murder and sentenced to death. The defendant's sole defense was that he was under the age of 18 at the time the murder was committed and thus not eligible for the death penalty. The jury was instructed on the issue, and it found against

the defendant. Here, by contrast, the issue of whether defendant was 18 at the time of the crime was not raised during the trial. ▮▮▮ ▬ ▮ ▮▮ Accordingly, there was no basis for instruction either sua sponte or even upon request (although no request had been made).[5] (See *People* v. *Flannel* (1979) 25 Cal.3d 668, 684-686 [160 Cal.Rptr. 84, 603 P.2d 1].)

We have found no authority indicating that the issue of a capital defendant's age must be determined at trial. Indeed, pretrial determination would be preferable in most instances, since prior to the June 5, 1990, passage of an initiative amendment (Prop. 115) to section 190.5, a defendant under the age of 18 could not have been charged with special circumstances.[6] (See *People* v. *Davis, supra,* 29 Cal.3d at p. 831; *People* v. *Spears, supra,* 33 Cal.3d 279.) Although no procedure is prescribed for making the determination, the statute is clear that the defendant bears the burden of proof on the issue.

In the present case, defendant had full opportunity to litigate the issue of his age. Conflicting evidence was presented, and the court found that the defense evidence was not credible. There was no error.

### PENALTY PHASE CONTENTIONS

Simultaneously with this opinion we are filing an opinion in the proceeding on defendant's petition for writ of habeas corpus in which we conclude that defendant is entitled to a new penalty trial as a result of ineffectiveness of trial counsel with regard to the penalty phase. Accordingly, we need not consider defendant's claims of error relating to the penalty phase of his trial.

### CONCLUSION

The judgment of guilt is affirmed.

Lucas, C. J., Arabian, J., Baxter, J., and George, J., concurred.

---

[5] A defendant's age is, however, a factor for the jury to consider at the penalty phase of the trial, and instruction on it is appropriate. (See § 190.3, factor (i).)

[6] Section 190.5 was amended by the initiative, effective June 6, 1990, to add two more paragraphs: "(b) The penalty for a defendant found guilty of murder in the first degree in any case in which one or more special circumstances enumerated in Section 190.2 or 190.25 has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life. [¶] (c) The trier of fact shall determine the existence of any special circumstance pursuant to the procedure set forth in Section 190.4."

**KENNARD, J.,** Dissenting.—Because I would grant defendant's petition for writ of habeas corpus and vacate the judgment of conviction (see *In re Marquez, post,* p. 584 [3 Cal.Rptr.2d 727, 822 P.2d 435] [dis. opn. of Kennard, J.]), I would dismiss the appeal as moot.

Mosk, J., concurred.

Appellant's petition for a rehearing was denied March 18, 1992. Mosk, J., and Kennard, J. were of the opinion that the petition should be granted.