Filed 8/25/20  P. v. Alvarado-Cisneros CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>MARCO ANTONIO ALVARADO-CISNEROS,<br><br>       Defendant and Appellant. | Case No.:  A158059<br><br>(San Mateo County Super. Ct. No. SF399919A)<br><br>**ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT]** |

**BY THE COURT:**

It is ordered that the opinion filed herein on August 24, 2020, be modified as follows:

On page 1, the caption should reflect the San Mateo County Superior Court Case Number as:  SF399919A.

The modification does not change the judgment

Dated: _____          _____, Acting P.J.

1

Filed 8/24/20 P. v. Alvarado-Cisneros CA1/5 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MARCO ANTONIO ALVARADO-CISNEROS,<br><br>        Defendant and Appellant. | A158059<br><br>(San Mateo County<br><br>Super. Ct. No. SF39919A) |

Eighteen-month old Dante M. died from head injuries which manifested while he was in the care of his mother's boyfriend, appellant Marco Antonio Alvarado-Cisneros.  Appellant was convicted following a jury trial of assault on a child causing death and involuntary manslaughter as a lesser included offense of murder.  (Pen. Code, §§ 273ab, 192, subd. (b).)[1]  He was sentenced to 25 years to life on the child assault count, with sentence on the involuntary manslaughter count stayed under section 654, and now appeals.[2]  Appellant argues the prosecutor committed prejudicial misconduct

---

[1] Further references are to the Penal Code.

[2] Appellant also plead guilty to several counts arising from crimes committed against Dante's mother that occurred after Dante's death:  two counts of kidnapping under section 207, subdivision (a), one count of first degree residential robbery under sections 211 and 212.5, three counts of inflicting corporal injury on a spouse or cohabitant under section 273.5,

1

during closing argument and urges us to remand the case for a hearing on his ability to pay fines and fees. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Family History*

Dante was born in 2013 and is the only child of Maria N. and her former husband Jesus M. His head was somewhat abnormal, with a flat spot and an unusually large circumference (in the 99th percentile), conditions which concerned Maria and were the subject of discussions with Dante's doctors. Dante was delayed in his ability to walk, and by 18 months still needed to hold on to furniture to assist him. Maria took Dante to the emergency room three times before he was five months old reporting that he was turning blue; he was released after doctors were unable to diagnose anything. He was also taken to the hospital once in April 2014 with complaints of a cough, fever and congestion. Despite this, Dr. Tricia Tayama, a pediatrician who later reviewed Dante's medical records, described his early history as unremarkable. She noted that a flat head is a common consequence of the current recommendation that babies sleep on their back and that Dante's head circumference, although large, had been stable.

Following some incidents of domestic violence, Maria and Jose separated in March or April of 2014 and Jesus left for Mexico. Shortly afterwards, appellant moved in with Maria.

For a period of time, Dante lived with and was primarily cared for by his grandmother (Maria's mother) at her own apartment. When Maria took Dante back into her home, the grandmother did not want him to go as she did

---

subdivision (a) and one count of misdemeanor false imprisonment under section 236. He received an aggregate sentence of seven years four months on these counts, consecutive to his 25-year-to-life term. This aspect of the judgment is not at issue on appeal.

not want him to be with appellant. Appellant told the grandmother he would "hurt [her] where it hurts the most."

Maria's sister, Estrella G., had helped her mother care for Dante and never saw any strange injuries on his body. She never saw him biting himself when she cared for him and never saw bite marks on his body. Dante would move his hands up and down when he wanted something, and on one occasion when he did this appellant told him "no hands" and hit Dante's hands 10 or 15 times. When Estrella told appellant he had no right to hit Dante, appellant responded that she and her mother had spoiled him and Dante could develop a habit and he might start biting his hands. Appellant once put Dante in the bedroom and told him, "if you are going to cry, you are going to cry for a reason."

With a couple of exceptions, Maria never noticed any unusual bruises or marks on Dante's body. One exception occurred on a day when she took Dante to the San Jose flea market with appellant, his five-or six-year-old son Sebastian, and some other people. When Maria returned to the group after leaving to go to the bathroom, Sebastian pointed to Dante's upper arm and said something had happened. Maria saw a mark on Dante's arm that later started to look like a bite. When she mentioned it to appellant, he said maybe Dante had bitten himself. Another exception occurred when she was changing Dante's diaper and saw a long red mark on his leg.

B. *The Incident*

Maria worked evenings for a janitorial service. On August 12, 2014, she spent the day with Dante and he seemed in good health. Maria watched appellant's son Sebastian while appellant slept and the two boys ate breakfast and then played together. In the afternoon, the family went to Safeway. At about 5:00 p.m., Maria changed into her uniform and, as was

3

her routine, gave Dante a sippy cup of milk and put him down in his crib for his evening nap. She then went to work and left Dante in appellant's care. She saw appellant's mother on the way out as she came to pick up Sebastian.

Shortly after 8:00 p.m., appellant called 911. The responding paramedic arrived to find Dante lying on his back on the floor, not moving and not responding to stimuli. Appellant said he had been watching Dante at home, that Dante began screaming "nonstop," that appellant went to the closet to get supplies to change Dante's diaper and that when he turned back, Dante was rigid with his arms clenched. Appellant denied that Dante had suffered any recent traumatic injury. There was bruising on Dante's arm that appeared to be bite marks, and appellant told the paramedics they were self-inflicted. Appellant's mother was at the apartment when the paramedics arrived.

Appellant gave essentially the same version of events to a detective that responded to the scene as he did to the paramedics. He also said that Dante usually bit himself, but had not done so that day. Maria arrived home as the ambulance was departing, having received a call to tell her that Dante had fainted. Dante was taken to the emergency room and then to the Lucille Packard Children's hospital for surgery. Dante died on the operating table.

C. *Prosecution's Medical Experts*

The prosecution called Dr. Samuel Cheshier, the pediatric neurosurgeon who performed emergency surgery on Dante at approximately 11:00 p.m. on the night of the incident. He testified that when he received the call, Dante was comatose but not quite brain-dead. The CT scan showed a "very large blood clot inside [Dante's] skull, but outside his brain, in a space we call the subdural." The neuroradiologist who had reviewed the CT scan before the surgery (Dr. Patrick Barnes) had indicated in his report that he

4

read the scan to show an acute subdural hematoma but he "could not rule out chronic" based on the image. Dr. Cheshier said that was a common phrase used in medicine to make sure nothing is overlooked, and explained that both a hyperacute bleed, which is actively bleeding, and a chronic bleed, which he defined as at least two weeks old, may appear the same on a CT scan. Observations made during surgery can rule out a chronic bleed.

Dr. Cheshier performed a left hemicraniectomy, which involved making a large incision on Dante's head to expose the skull and removing the entire left side of the skull. He found a subdural hematoma so large it pushed the brain over to the other side of the skull. He observed an acute bleed, meaning it had happened that day, and hyperacute bleeding, meaning it was actively bleeding. Blood was spurting from the sagittal sinus, a very large vein in the middle of the brain that neurosurgeons are loathe to deal with because if injured it is difficult to repair and if the surgeon sacrifices the vein the patient usually dies. Dr. Cheshier had no doubt that Dante's subdural hematoma was hyperacute because he saw it when he opened the skull.

Once he opened Dante's skull, Dr. Cheshier was able to rule out the possibility of a chronic bleed, something which could not have been done from reading the CT scan alone. Chronic bleeds are very rare in 18-month-old children in any event: "Those are things that . . . elderly people get." Another indication the bleed was not chronic was that once the blood was removed from the surface of the brain, the brain went back into position; if the bleed had been chronic, it would have remained relaxed because it would have had time to adjust to the pressure. Dr. Cheshier got control of the bleeding using clotting material (which showed that Dante had the ability to clot normally) and removed the hematoma from the surface of the brain.

After the hematoma was removed, Dante's blood pressure dropped and his condition began to spiral down until he was declared dead at 11:41 p.m.

An autopsy performed by Dr. Thomas Rogers revealed that a number of bruises had been inflicted before death, including three marks that appeared to be bite marks on Dante's wrist, arm and cheek, six bruises on each leg, and seven bruises on his torso. Bruises on the left side of Dante's head might have occurred during surgery, but bruises on the right side of his head were not in the surgical area. All the bruises on Dante's body were in hemorrhage, and from the amount of iron present in the bruises, they could have been inflicted from a few hours prior to death to three days earlier. Dante had no trauma to his inner organs nor skull fractures.

The area of hemorrhage on Dante's brain was consistent with blunt force trauma. Dr. Rogers concluded that the cause of death was blunt injuries to the head. A short fall onto a hard surface could be blunt force trauma. Dr. Rogers could not say whether the injuries were accidental or intentional.

Dr. Peter Egbert was an ophthalmologist and pathologist who examined Dante's eyes after his death. He discovered a hemorrhage in the retina and around the optic nerve, of a type seen almost exclusively in abusive injuries. He had not had any patients who had suffered retinal hemorrhages after a short fall. A slow increase in pressure in the brain would not cause a retinal hemorrhage. The hemorrhage seen in Dante's eyes was consistent with a subdural hematoma and consistent with a nonaccidental injury.

Dr. Hannes Vogel, a neuropathologist, examined Dante's brain after his death. He found bleeding in the arachnoid membrane covering the brain, diffuse cerebral edema (swelling), an intracranial hemorrhage, a swollen and

distended sagittal sinus, and diffuse axonal injury. In cases of severe head trauma, the axons, which are the wiring of the brain, get sheared or torn. The injuries Dante received were consistent with blunt force injury, and a very severe force would have been required—a fall from a three story building, for example, or a high speed car accident. The axonal injury was consistent with rotational force, which could also explain the eye injuries noted by Dr. Egbert. The lack of a skull fracture did not affect Dr. Vogel's opinion as it was well known that diffuse axonal injuries and subdural hematomas can occur without fractures. The amount of force necessary to account for Dante's injuries would render him unconscious immediately and could have caused a seizure.

Dr. Tayama, a pediatrician who specialized in the area of child abuse, reviewed Dante's medical records for the purpose of forming an opinion about his death. She did so at the request of the county's child protective services agency, because the disposition of a related child was at issue (appellant and Maria's son, who was born after Dante died). Dr. Tayama believed the injuries to his eyes and brain were consistent with shaking or forceful impact. A short fall two to three weeks prior to his death would not account for his injuries and would probably not account for more than a bruise. Some of Dante's bruises were concerning because they were not in a location one would expect from a fall. There was no evidence of hydrocephalus.

D. *Defense Evidence*

Appellant's defense at trial was that the prosecution had not carried its burden of proving that Dante's injuries were caused by an assault while he was in appellant's care. Instead, there was a reasonable doubt regarding appellant's guilt because there was evidence that Dante's injuries could have

7

been the product of a bleed in the brain that was caused by a preexisting medical condition and/or prior falls.

The defense elicited testimony that during the investigation into the cause of Dante's death, Maria revealed a history of prior short falls. A week or two before his death, Dante fell down the front concrete steps of their apartment when Maria was taking out the garbage. He received a scratch on the right side of his nose and a medium bump on his forehead. Another time, he was crawling on a stack of laundry when he fell from the top of it and bled from his nose. On another occasion when Maria was at her older sister's house, Dante fell from a chair at the kitchen table as he tried to grab a falling toy. When Maria was still with Dante's father, Jesus, Dante fell from the bed onto a tile floor while she was looking for some papers. Dante never lost consciousness, got sleepy or threw up after these prior falls.

Maria told investigating detectives that Dante might have died as a result of these earlier falls. She thinks a detective told her it was either her or appellant who was responsible for Dante's death. Appellant said for many months that Dante's death was an accident and he and his mother told Maria not to trust the police during the investigation. Maria was pregnant with appellant's child and afraid the authorities would take the baby away from her (which they did). On Facebook, Maria told an acquaintance, "since Dante had a blood clot on his brain and he fell down on me when I had him they think we are lying to them and according to them I or Marco are suspected of giving him a blow to the head." She continued, "Dante didn't even know how to walk. He would hit himself all the time. And that day when he fell down, he fell down from the stairs at the entrance to where I was living before. And he hit his head and he got a real huge bump on his forehead and blood came out of his nose. I think the clot was caused by that blow. He fell down about

8

three times in a short time.  Two in the house and another at my sister's house and all three blows were in the head.  But those Goddamn people don't understand that accidents happen."

The defense also presented the testimony of experts to contradict the prosecution's evidence that Dante's injuries could not have been caused by the falls described by Maria or by a medical condition that also resulted in his large and/or flattened head.  Dr. Patrick Barnes, the pediatric neuroradiologist who performed the CT scans on Dante when he was brought to the hospital, was called as a defense witness and reported a mixed-density hemorrhage to the brain, with some of the bleed being hyperacute and some being three hours to seven days old.  Had Dante been stable enough for an MRI, they could have more accurately identified the time of the bleed.  Dr. Barnes believed the doctors should have looked into whether Dante had a condition that predisposed him to his injuries.  It was impossible to tell whether the axonal injury was due to trauma or to a lack of blood flow such as what happens when one has a stroke.  A big head can predispose a child to hemorrhage either spontaneously or with minor trauma.

In Dr. Barnes's opinion, Dante was not developing normally because he could not yet walk unassisted; a male who could only say a few words at 18 months is cognitively delayed.  Photographs of Dante show the left eye turning in, which could be a sign of increased cranial pressure.  A short fall of three to six feet is sufficient to produce a subdural hematoma.  Dante's subdural hematoma could have been caused by his prior falls, which in turn could have resulted in a slow bleed.  Children with brain bleeds can present normally for days and then spontaneously become unconscious.

Dr. Jan Leetsma was called as the defense expert in neuropathology. Dante's head circumference caused him concern, as did the flattened head.

9

Sixth nerve palsy is caused by pressure in the skull, and Dante's eyes were indicative of this because photographs of him taken before his death showed them to be turned in.[3] Dante's prior falls could have caused a subdural hematoma, and it was not realistic to think his injuries could only be caused by a high velocity accident or a high fall. There was evidence of an axonal injury but not from trauma. It was possible Dante was beaten but one would expect to see a skull fracture. There was a neomembrane that indicated an old injury. The injury to the sagittal sinus could have been torn during surgery.

E. *Rebuttal*

Dr. Terri Haddix is a neuropathologist called as a rebuttal witness. She testified that Dante was not hydrocephalic, and that his brain filled due to trauma. A child would not have a slow bleed of the brain or a slow leak of the sagittal sinus and not show symptoms. Some of his axonal injuries were due to trauma and some were due to the lack of oxygen, but they all originated in the same traumatic event. His symptoms were all consistent with the infliction of trauma.

DISCUSSION

A. *Prosecutorial Misconduct*

Appellant argues the prosecutor made a number of statements during closing argument that attacked defense counsel's integrity, injected his own personal views into the case, improperly vouched for prosecution witnesses and resorted to emotional appeals. He contends that these statements constituted prejudicial prosecutorial misconduct requiring reversal, and that

---

[3] Dr. Cheshier testified that this condition is diagnosed after a very detailed neurological examination. In his opinion, it would be malpractice to make a diagnosis based only on a photograph.

10

defense counsel provided ineffective assistance to the extent she failed to object. We do not agree that the remarks complained of amounted to misconduct, and in any event, counsel forfeited all but one of his challenges in failing to object. He cannot prevail on an alternative theory of ineffective assistance of counsel when counsel may have had a tactical reason in failing to object and prejudice was not proven.

    1. <u>Challenged Argument</u>

Appellant identifies several comments by the prosecutor as being problematic. The prosecutor referred to the cross-examination of Dr. Tayama, a prosecution expert, as being by "the defense attorney" and suggested that questions about whether Dante's head could be from parental neglect spoke to "the ceaselessness, to the insincerity of the defense's attempt to deflect, to find something, anything . . . to explain away this guy's assault on this defenseless child." The prosecutor also argued that testimony about Maria's statement on Facebook about the police wanting someone to be guilty was made just to "dirty her up" and "made [her] look bad and that is really shady." According to the prosecutor, the defense was "in a sense" blaming Dante for his own death by focusing on his history of falls.

Appellant complains the prosecutor referred to the defense "still try[ing] to create all this evidence of [a] big head . . . as being something related to how he died. We know it's not." He notes that the prosecutor described Dr. Leetsma as being part of the "deflection that they engaged in to find some other excuse for the evidence," and suggested in his testimony that Dr. Cheshier might have cut the sagittal sinus during surgery as "almost uncomfortable. It was uncomfortable." The prosecutor described Dr. Cheshier as a skilled surgeon and argued it was "outrageous, and it is shameful, shameful" to "impugn the capability and honesty of a surgeon like

Dr. Cheshier. That is shameful." The prosecutor argued that to suggest the surgeon who was trying to save Dante's life actually caused the bleed to the sagittal sinus was a "conspiracy."

Appellant argues the prosecution improperly attacked the defense witnesses Drs. Barnes and Leetsma by talking about what they were trying to "sell" the jury. He notes that the prosecutor attacked Dr. Barnes for his testimony suggesting Maria should have been concerned about Dante's prior fall from a pile of laundry and said that testimony was "shameful. That is a shameful statement to make of the state of the evidence in this case." And the prosecutor suggested Dr. Barnes had "sandbagged" the prosecution by testifying beyond what was in his two-page report, stating that was "inherently unfair and inherently unprofessional." Defense counsel only objected to the last comment. In response to the defense objection that this was improper argument, the court advised the jury, "Comments during arguments by counsel are up to the [jury] to take them as you wish."

2. General Principles

"Prosecutorial misconduct involves the use of deceptive or reprehensible methods in an effort to attempt to persuade the jury (*People v. Hill* (1998) 17 Cal.4th 800, 819 (*Hill*) [misconduct violating state Constitution]) or actions so egregious as to infect the trial with unfairness (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214 [(*Gionis*)] [misconduct violating federal Constitution])." (*People v. Carter* (2003) 30 Cal.4th 1166, 1207.) Our focus is on the effect of the action on the defendant, not on the intent or bad faith of the prosecutor. (*People v. Crew* (2003) 31 Cal.4th 822, 839.)

When the alleged misconduct consists of remarks to the jury, " 'the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.

12

[Citations.]  In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.  [Citation.]' " (*People v. Brown* (2003) 31 Cal.4th 518, 553–554.)  Generally, " ' " 'a prosecutor is given wide latitude during argument.  The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " ' " (*Hill, supra*, 17 Cal.4th at p. 819.) " ' " 'A prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness' " [citation], and he may "use appropriate epithets. . . ." ' " ' [Citation]." (*Ibid.*)  "To demonstrate misconduct, we must view the statements in the context of the argument as a whole." (*People v. Dennis* (1998) 17 Cal.4th 468, 522.)

One example of prosecutorial misconduct during closing argument is disparaging opposing counsel.  (*Gionis, supra*, 9 Cal.4th at p. 1215.)  Another brand of misconduct involves vouching for the strength of the prosecution's case by invoking the prosecutor's personal prestige, reputation, or depth of experience, or the prestige or reputation of the office, in support of it.  (*People v. Huggins* (2006) 38 Cal.4th 175, 206–207 (*Huggins*).)  Prosecutors also may not offer personal opinions regarding the evidence that are based on facts outside the record.  (*Id.* at p. 207.)  And they may not appeal to the jury's passion or  prejudices:  "It is, of course, improper to make arguments to the jury that give it the impression that 'emotion may reign over reason,' and to present 'irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response.' " (*People v. Redd* (2010) 48 Cal.4th 691, 742 (*Redd*).)

"To preserve a prosecutorial misconduct claim for appeal, the defendant ' "must make a timely and specific objection and ask the trial court to

13

admonish the jury to disregard the impropriety" ' unless doing so would be futile or an admonition would not cure the harm." (*People v. Whalen* (2013) 56 Cal.4th 1, 52.)  Failure to make a timely objection generally forfeits the claim.  (*Ibid.*)

" 'A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 674.)  To prevail on a claim of ineffective assistance of counsel, a defendant must show trial counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms and those deficiencies resulted in a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694; accord, *Centeno*, at pp. 674, 676.)

" 'Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." ' [Citations.]  When the record on direct appeal sheds no light on why counsel failed to act in the manner challenged, defendant must show that there was ' " 'no conceivable tactical purpose' " for counsel's act or omission.  [Citations.]' [Citation.] '[T]he decision facing counsel in the midst of trial over whether to object to comments made by the prosecutor in closing argument is a highly tactical one . . . .  [Citations],' and 'a mere failure to object to evidence or argument seldom establishes counsel's incompetence[.]' " (*Centeno*, *supra*, 60 Cal.4th at pp. 674–675.)  If there is "no sound legal basis for objection, counsel's failure to object to the admission of the evidence cannot establish ineffective assistance." (*People v. Cudjo* (1993)

14

6 Cal.4th 585, 616; *People v. Jackson* (2016) 1 Cal.5th 269, 349; *People v. Weaver* (2001) 26 Cal.4th 876, 925–926.)

### 3. The Prosecution Did Not Denigrate Counsel or Vouch for Witnesses

Appellant complains that the prosecutor impermissibly denigrated defense counsel by characterizing her cross-examination of Dr. Tayama as insincere and an attempt to deflect, and by stating that it was "really shady" for defense counsel to present evidence of Maria's statements to the police about Dante's prior falls. The prosecution's comments were strong, but were focused upon counsel's actions in examining witnesses and not on counsel's integrity. (*People v. Pearson* (2013) 56 Cal.4th 393, 432; *Huggins, supra,* 38 Cal.4th at p. 207 [not misconduct for prosecutor to argue defense counsel tried to "smoke one past us"]; *People v. Marquez* (1992) 1 Cal.4th 553, 575–576 [no misconduct in referring to defense as "smokescreen"].)

Our Supreme Court has made clear that "wide latitude" is the standard applied to a prosecutor's comments on defense counsel's tactics and factual accounts: "It is generally improper for the prosecutor to accuse defense counsel of fabricating a defense [citations], or to imply that counsel is free to deceive the jury [citation]. Such attacks on counsel's credibility risk focusing the jury's attention on irrelevant matters and diverting the prosecution from its proper role of commenting on the evidence and drawing reasonable inferences therefrom. [Citations.] [¶] Nevertheless, the prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account. . . . Misconduct claims also have been rejected . . . where the prosecutor criticizes the defense theory of the case because it lacks evidentiary support." (*People v. Bemore* (2000) 22 Cal.4th 809, 846.)

Appellant also complains that the prosecutor vouched for Dr. Cheshier. We disagree. "Prosecutorial assurances, based on the record, regarding the

15

apparent honesty or reliability of prosecution witnesses, cannot be characterized as improper 'vouching,' which usually involves an attempt to bolster a witness by reference to facts outside the record." (*People v. Medina* (1995) 11 Cal.4th 694, 757, italics omitted.) The prosecutor suggested that Dr. Cheshier was a competent surgeon—an assertion supported by the record—and urged the jury to credit his testimony, but he did not do so based on facts outside the record.

Nor are we persuaded that the cited remarks were an improper statement of the prosecutor's opinion, as opposed to simply his view of the evidence presented, or invited an emotional or irrational response to the evidence. (*People v. Redd* (2010) 48 Cal.4th 691, 743; *People v. Ghent* (1987) 43 Cal.3d 739, 772.) "It is not [] misconduct "to ask the jury to believe the prosecution's version of events as drawn from the evidence. Closing argument in a criminal trial is nothing more than a request, albeit usually lengthy and presented in narrative form, to believe each party's interpretation, proved or logically inferred from the evidence, of the events that led to the trial. It is not misconduct for a party to make explicit what is implicit in every closing argument, and that is essentially what the prosecutor did here." (*Huggins*, *supra*, 38 Cal.4th at p. 207.)

4. <u>Appellant Has Not Demonstrated Ineffective Assistance of Counsel</u>

Even if we assume some of the remarks crossed the line into prosecutorial misconduct, we would affirm. Appellant objected only to the argument that Dr. Barnes "sandbagged" the prosecution by failing to write a more detailed report. Thus, he has largely forfeited his claims of prosecutorial misconduct, unless he can demonstrate that his counsel was ineffective in failing to object. This he cannot do.

On direct appeal, we " 'will reverse convictions on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.' " (*People v. Zapien* (1993) 4 Cal.4th 929, 980.) "[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502.)

A failure to object in closing argument can often be explained by an attorney's tactical determination that: (1) the objectionable statement is not sufficiently damaging to warrant objection; and/or (2) an objection would highlight the objectionable statement (or inference to be drawn from that statement), causing more prejudice than the objectionable statement alone. Given these considerations, and the split-second decision required to lodge a timely objection during an opponent's closing argument, courts routinely have recognized that "the decision facing counsel in the midst of trial over whether to object to comments made by the prosecutor in closing argument is a highly tactical one." (*People v. Padilla* (1995) 11 Cal.4th 891, 942, overruled on other grounds in *Hill*, *supra*, 17 Cal.4th at p. 823, fn. 1.)

In the instant case, defense counsel's failure to object could easily have been based on permissible tactical considerations. The gist of the objectionable comments was that appellant, though clearly responsible for Dante's injuries, was trying to blame them on other circumstances—on prior falls, on issues involving Dante's abnormal head shape and circumference, on Maria's negligence in caring for him, and on his medical treatment. Defense counsel effectively addressed these comments in her own closing argument.

Counsel also specifically addressed the points that are alleged to be misconduct, including Dr. Leetsma's opinion that the sagittal sinus may have been severed during the surgery performed by Dr. Cheshier. "Now talking

17

about [the] sagittal sinus, I know [the prosecutor] said how could Dr. Leetsma literally accuse or somehow imply that Dr. Cheshier created this injury? No, that was never the implication. If you recall his testimony, the question was how does one get an injury to the sagittal sinus. Well, if you really want to know the answer, here are the various ways. Right? And one of them could be surgical. That's not saying Dr. Cheshier did it. And it certainly wasn't us trying to deflect or pinning the blame on Dr. Cheshier."

Counsel also addressed the testimony about Maria's statements on Facebook about the authorities saying it was either her or Marco, and wanting someone to be guilty, which was alleged by the prosecution to have been elicited only to "dirty her up." "Why is she saying this in May? Is she saying it because she's being told to say it? Of course not, these are personal Facebook messages she's having. . . What does that tell us? Because that's what she's believing herself."

Thus, defense counsel might have believed it was more effective to rebut the prosecutor's argument through her own argument rather than to object and therefore highlight it. This is not a situation where "there simply could be no satisfactory explanation" for counsel's failure to object, and reversal on the ground of ineffective assistance of counsel is therefore not warranted. (*People v. Gray* (2005) 37 Cal.4th 168, 207; *People v. Wharton* (1991) 53 Cal.3d 522, 567 [finding no ineffectiveness where counsel failed to object to prosecutor's reference to evidence outside the record, because counsel might not have wanted to highlight the point with the jury]; *People v. Milner* (1988) 45 Cal.3d 227, 245 [finding no ineffectiveness where counsel would have acted well within the bounds of reasonable competence had he chosen to ignore the statements rather than draw attention to them with an objection].)

18

5. The Comments to Which Defense Counsel Objected Were Not Misconduct

Defense counsel did make one objection during the prosecution's closing argument. We conclude the remarks objected to, which had to do with the credibility of Dr. Barnes, a defense witness and a treating neuroradiologist who read Dante's CT scan, did not amount to misconduct. "[D]iscrediting a defense witness does not constitute misconduct provided that the 'prosecutor's argument merely focused on the evidentiary reasons why [an expert's opinions] could not be trusted.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 335.)

When the prosecutor cross-examined Dr. Barnes, he questioned him about why his report regarding the CT scan in this case was only two pages long and did not contain many of the opinions he offered at trial. During rebuttal, the prosecutor argued, "And what [Dr. Barnes] was offered for by [defense counsel] was so far beyond what was in those two pages [of his report] that it became unfair. That's not the way the expert witness should testify. That's not the way the evidence should be presented in court by an attempt not to record statements [to] be able to give to the other side, to be able to prepare and anticipate for it. So you are not sandbagged." After an objection was lodged to these comments, the prosecutor characterized Dr. Barnes's preparation of a report that did not give notice of what his testimony would be as "inherently unfair and inherently unprofessional when the scope of why he was relevant was reading the CT scan to say I– remember this: I don't know. That's why he said, can't rule out chronic because I'm limited by the CT. It doesn't tell me everything I need to do. Even Dr. Barnes would agree, did agree what would tell you is the MRI, the surgeon, the pathologist. [¶] So that's who we call, the surgeon [and] the pathologist, to help flush that

19

out. There wasn't anything more relevant to the reading of the CT scan other than it was, I don't know what it shows. It might show an acute, it shows an acute and might show a chronic, rule it out; and that's what they did."

The thrust of this argument was that if you looked at Dr. Barnes's report, it was limited to stating that a chronic bleed could not be ruled out based on the CT scan, yet his testimony regarding the possibility that this injury was caused by a prior bleed was far more extensive. This was in response to defense counsel's own argument urging the jury that Dr. Barnes's testimony had raised a reasonable doubt as to whether Dante's subdural hematoma was caused by a prior injury, and that the prosecutor had the opportunity to talk with Dr. Barnes as a treating physician but failed to do so.[4] " '[H]arsh and colorful attacks on the credibility of opposing *witnesses* are permissible.' " (*People v. Parson* (2008) 44 Cal.4th 332, 360.) The prosecutor's comments were a reasonable critique of a defense expert witness and do not amount to misconduct.

B. *Fines and Fees*

Although appellant does not present a separate argument regarding the fines, fees and assessments imposed at sentencing, in the conclusion of his opening brief he suggests that if the convictions are not reversed the case should nonetheless be remanded for a hearing on his ability to pay those fees and fines. Any contention regarding ability to pay is forfeited as improperly presented. (Cal. Rules of Court, rule 8.204 [briefs must "[s]tate each point

---

[4] Defense counsel argued, "And I would ask you to consider this—I was actually pretty surprised . . . that [the prosecutor], when Dr. Barnes came in to testify and cross-examination started by [the prosecutor], he literally raised his voice and was on the attack with Dr. Barnes. . . . [¶] It's interesting [] that Dr. Barnes was the treating neuroradiologist who did the CAT scan. He was on the prosecution witness list. He is someone who has been known to the prosecution just like all the other doctors they called."

under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority"]; *Consolidated Irrigation Dist. v. City of Selma* (2012) 204 Cal.App.4th 187, 201 [failure to comply with rule requiring that each argument be presented under a separate heading forfeits the arguments]; *County of Butte v. Emergency Medical Services Authority* (2010) 187 Cal.App.4th 1175, 1196, fn. 7 [contention not supported by citation to legal authority is forfeited].)  In any event, appellant clearly had the ability to pay the $330 restitution fine imposed out of his prison wages.  (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1035.)

## DISPOSITION

The judgment is affirmed.

_____

NEEDHAM, J.

We concur.

_____

SIMONS, Acting P. J.

_____

BURNS, J.

*People v. Alvarado-Cisneros* / A158059

22