Filed 12/24/20  P. v. Canada CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B300611 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA458923) |
| v. | |
| DEJON CANADA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Perry, Judge.  Affirmed as modified.

Sally Patrone Brajevich, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael C. Keller and William N. Frank, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Dejon Canada was convicted of one count of voluntary manslaughter (Pen. Code, § 192, subd. (a))[1]. The jury found true allegations that he personally and intentionally discharged a firearm (§ 12022.5, subd. (a). The trial court found true allegations that appellant served eight prior prison terms (§ 667.5, subd. (b)). The court sentenced appellant to a total of 29 years in prison.

Appellant appeals from the judgment of conviction, contending 1) the trial court violated his constitutional rights by conducting hearings during his involuntary absence; 2) insufficient evidence supports his conviction because the eyewitness testimony is so unreliable and the evidence establishes perfect self-defense as a matter of law; 3) the prosecutor committed misconduct during closing argument by referring to evidence outside the record, maligning defense counsel, and attempting to shift the burden of proof; 4) the section 667.5 prison priors must be stricken due to a change in the law; and 5) the trial court erred in imposing certain fines and fees without conducting an ability-to-pay hearing.

Respondent agrees, as do we, that the section 667.5 enhancement terms must be stricken, reducing appellant's total sentence to 21 years. We find no prejudicial error and so affirm the judgment of conviction in all other respects.

---

[1] Further undesignated statutory references are to the Penal Code.

2

# BACKGROUND

On October 16, 2016, several people were living in tents or other makeshift shelters on Ceres Avenue between 6th and 7th Streets in downtown Los Angeles.  At about 1:30 a.m., Los Angeles Police Department (LAPD) officers responded to a call of shots fired in the vicinity of 7th and Ceres.  There they discovered a gravely injured Ronald Pugh.  Pugh had been shot in the shoulder and head.  He was taken to a hospital and then a nursing home, where he died on June 20, 2107 from the gunshot wound to his head.

Police discovered four 9 mm shell casings and two expended projectiles in the area.  One projectile was in a pool of blood.  Police also found a .38 caliber firearm behind the rear passenger side wheel of a recreational vehicle parked on the street.  This weapon did not fire the casings found at the scene.  A private investigator swabbed the .38 caliber gun for DNA evidence to compare with a DNA sample from Pugh.  No DNA evidence was introduced at trial by either side.  An LAPD forensic fingerprint specialist tested the .38 caliber gun and the magazine inside it.  There were no prints on the gun and no usable prints on the magazine.

Police spoke with a number of people at the scene.  Three people living on Ceres testified at trial:  Louis Grady, William Bird and Regina Davis.

Louis Grady was standing outside his tent on Ceres Avenue on the night of October 16, 2016.  He testified he heard gunshots but did not see anything.  He started to move toward the sound of the gunshots and saw appellant running down the street toward him.  Grady had seen appellant in the area before.  During direct

examination Grady testified he did not see or hear an argument before the shooting.

At trial, Grady acknowledged he had discussed the shooting with LAPD Detective Jonathan Vander Lee. Grady did not remember details of his statements to the detective, and so the prosecutor played portions of that recorded interview. After listening to a portion of the recording, Grady testified he did overhear an argument right before the shooting. Grady claimed, however, not to remember making other statements on the tape. The court found Grady was not cooperating and was deliberately not remembering the interview. The court permitted the prosecutor to play Grady's entire interview for the jury. The court reporter did not transcribe the contents of the tape, but the record includes a copy of an unofficial transcript which was admitted into evidence.

According to the transcript, Grady told police he heard an argument between appellant and Pugh, walked closer to see what was happening, saw appellant fall, and then "[h]e come out with the gun, I saw him come out with the gun." Appellant fired four or five times and Pugh fell to the ground. Appellant ran towards and turned onto 7th Street.

Direct examination of Grady ended with the prosecutor showing Grady a six-pack photographic line-up on which he had previously identified the shooter. The prosecutor asked Grady if he saw appellant shoot Pugh, and Grady replied, "Yes."

On cross-examination, Grady gave a different account of events. In this account, appellant fell down, got up, and moved behind the van and out of Grady's sight. Grady then heard gunshots and saw appellant running toward him.

4

Grady acknowledged he was in custody on an unrelated narcotics matter when detectives interviewed him. Grady denied he hoped to receive a benefit in that case by talking to detectives about this one. He admitted several prior criminal convictions.[2]

On redirect, Grady affirmed he saw a gun in appellant's hand, saw appellant move towards Pugh, heard gunshots, and then saw appellant run away; Grady did not see appellant pull the trigger.

William Bird was also present on Ceres on the night of October 16, 2016. In January 2017 he was interviewed by Detective Vander Lee. Bird told Detective Vander Lee he saw appellant produce a gun and fire several shots at Pugh. Bird said he did not see Pugh with a gun. Bird identified appellant from a six-pack photographic line-up. Bird also told Detective Vander Lee after that night appellant continued to come to the area with a gun and threaten people.

At trial, Bird gave a different account of the shooting, testifying that shortly before the shooting, he was outside his tent on Ceres Street, across the street and at a little bit of an angle to the location where Pugh was shot. Bird had seen appellant in the area on multiple occasions. He heard an argument between appellant and Pugh over money. The argument turned into a

---

[2] In his briefing, appellant cites Grady's preliminary hearing testimony as if it were trial evidence. Appellant does not provide any citation to the reporter's transcript where Grady was impeached at trial with his preliminary hearing testimony. In fact, one of appellant's claims of error on appeal raises the trial court's denial of his request for judicial notice of that transcript. Accordingly, in analyzing Grady's claims, we do not consider his preliminary hearing testimony.

5

fistfight.  Bird was able to see the fight.  He did not see the shooting.  He was not really paying attention to the fight when he heard gunshots.  He then ducked behind a parked car for cover.  When the shooting stopped, Bird fled the block.  Bird was impeached with his prior statements to Detective Vander Lee.

On cross-examination, defense counsel explored Bird's many prior, mostly drug-related felony convictions.  Bird also acknowledged he was a methamphetamine user who had used methamphetamine at about 5 p.m. before the early morning shooting.  Bird testified that using methamphetamine did not affect what he saw and heard.  Bird described the fistfight as both men throwing punches and no one falling down.  He said the fight had stopped and Pugh was backing away when he was shot.  Bird acknowledged he made his statement to Detective Vander Lee after he was arrested on unrelated charges.

Regina Davis was also present on Ceres Avenue when Pugh was shot.  Pugh was the father of Davis's child.  She was familiar with appellant from living on Ceres Avenue.  Davis testified to two interactions between Pugh and appellant.  In the first interaction, Pugh asked appellant about money he owed to Pugh.  Appellant did not respond and Pugh left.  Less than 10 minutes later, Pugh returned with a friend named "Killer" and again asked for his money.  Pugh patted appellant's shirt pocket and said appellant had his money in the pocket.  Pugh then pushed appellant, knocking him backwards.  Appellant almost fell, but caught himself.  As he regained his balance, he pulled out a gun and fired multiple times at Pugh.  Davis testified Pugh's friend "Killer" left before Pugh punched appellant.  She also testified that she did not see Pugh with a gun.

6

On cross-examination, Davis acknowledged her true last name was Swingler and over the year she had used many aliases to obtain release after multiple arrests. Davis's testimony was impeached with a statement she made at the scene of the shooting and statements she made in July 6, 2017 interview with Detective Vander Lee.[3] At the scene, she may have told a law enforcement officer she did not see anything. Her statements at the July 6, 2017 interview were largely consistent with her trial testimony. Davis did tell detectives that Pugh's current girlfriend searched Pugh's body after he was shot and removed Pugh's supply of narcotics from his pocket.[4]

Appellant presented an alibi defense. His girlfriend Regina Clay testified she went to a wedding on October 15, 2016 and when she returned home at about 11:00 p.m., appellant was

---

[3] There is some ambiguity in the record about whether, due to technical difficulties, defense counsel was able to play the recording of Davis's testimony from the scene. There is also ambiguity in the record about how much of the interview was played while Davis was on the stand; parts may have been played later.

[4] Appellant repeatedly states that either Pugh or his companion had a gun. No one saw either man with a gun. At times Davis stated she believed Pugh had a gun; at other times she stated Pugh did not have a gun, but his companion did. However, she never claimed to have actually seen a gun. At times, her speculative belief seemed to be based on equally unfounded statements by others.

At most, a jury might have inferred Pugh had a gun because a gun was found underneath a nearby recreational vehicle. This would, at best, have been a weak inference because no physical evidence linked Pugh or anyone else to that gun.

there.  They went to bed together and stayed at her home until 8:00 or 9:00a.m.  Clay did not live in downtown Los Angeles.

## DISCUSSION

A.    *Appellant Was Not Prejudiced by Hearings Held in His Absence.*

In his opening brief, appellant contended the trial court violated his state and federal constitutional rights to be present, to due process, and to confront adverse witnesses when the court decided legal issues during his involuntary absence on the morning of June 24, 2019.  While appellant was absent from the courtroom, the trial court held a hearing on 1) what portions of a recorded interview appellant could use to impeach Davis during her cross-examination; 2) Alternate Juror No. 2's request to be excused for financial hardship; and 3) appellant's request that the court take judicial notice of Grady's preliminary hearing testimony.

The Confrontation Clause of the United States Constitution guarantees a criminal defendant the right to be present for cross-examination of adverse witnesses, while the Due Process Clause guarantees "the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." (*Kentucky v. Stincer* (1987) 482 U.S. 730, 740, 745.)  The California Constitution provides similar protections.  (*People v. Romero* (2008) 44 Cal.4th 386, 418.)

Generally, a defendant does not have the right to be present at discussions which occur outside the presence of the jury and involve questions of law.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1231; *People v. Perry* (2006) 38 Cal.4th 302, 312

8

["a defendant may ordinarily be excluded from conferences on questions of law, even if those questions are critical to the outcome of the case, because the defendant's presence would not contribute to the fairness of the proceeding"].)

We independently review claims that implicate a defendant's confrontation rights and deferentially review a trial court's resolution of factual disputes involved in that claim. (See *People v. Seijas* (2005) 36 Cal.4th 291, 304.) The defendant bears the burden of showing " 'how this hearing was unfair or that his presence at the hearing would conceivably have changed the result.' " (*Hovey v. Ayers* (9th Cir. 2006) 458 F.3d 892, 902–903.)

### 1.    Recorded Interview

At some point before the morning of June 24, 2019, appellant made a motion to introduce portions of a recorded interview of Davis. This motion was the first matter heard by the trial court on the morning of appellant's absence. The trial court overruled the prosecutor's objections, with the exception of one hearsay objection involving Davis's repetition of another person's statement to her. The prosecutor then sought to have an additional portion of the interview played. Defense counsel objected on hearsay grounds with which the trial court agreed. Thus, appellant's motion to introduce portions of the Davis interview was highly successful. The only exception was the exclusion of one portion of the interview involving hearsay. This was a legal issue, and appellant could not have provided useful insight to his trial counsel on this topic. Put differently, even assuming for the sake of argument that the trial court erred in deciding this issue in appellant's absence, there is no reasonable possibility that appellant would have obtained a more favorable outcome if he had been present.

9

2.    Alternate Juror No. 2

Alternate Juror No. 2's request to be excused due to financial hardship was the second matter considered by the court in appellant's absence.  In his Opening Brief, appellant contended the trial court decided to excuse the juror after hearing his explanation of financial hardship, while appellant was absent.  That is too narrow a view of events.

After questioning Alternate Juror No. 2, the court indicated it would excuse the juror at 3 p.m.  At the end of the day, however, the court asked Alternate Juror No. 2 to give it one more day.  Alternate Juror No. 2 agreed to stay.  At the end of the next day, June 25, 2019, Alternate Juror No. 2 again agreed to stay.  After that deliberations began, and Alternate Juror No. 2 was placed on call.

Although respondent points out in its brief that Alternate Juror No. 2 "withdrew" his request to be excused, appellant does not directly address this situation in his Reply Brief.  He simply argues he should have been present to observe the interaction with the juror and evaluate the court's response "before the court decided to release him."

Taking appellant's claim at its broadest, and assuming for the sake of argument that appellant had a right to be present during this interaction regardless of the ultimate outcome, appellant has not shown any prejudice from his absence.  Leaving aside the specifics of the court's ruling, no sitting juror sought to be excused during the remainder of the trial or during deliberations and there were no motions to dismiss any sitting jurors.  Further, there was another alternate juror in the case.  It cannot reasonably be inferred that Alternate Juror No. 2's

10

absence or presence could have inhibited or prompted sitting jurors to ask to be excused.

### 3. Grady's Preliminary Hearing Testimony

The third matter considered by the court in appellant's absence involved prosecution witness Grady. Appellant asked the court to take judicial notice of Grady's preliminary hearing testimony where Grady testified the detective said he would talk to the district attorney about Grady's pending case. When appellant made the request for judicial notice Grady had completed his trial testimony and had denied expecting to receive a benefit for his information. Appellant had not attempted to impeach Grady with his prior preliminary hearing testimony.[5]

---

[5] During cross-examination, appellant asked Grady if he made statements to Detective Vander Lee because he thought it would help him on his pending parole violation. Grady replied: "No." Appellant then asked Grady: "Well, when you testified at the preliminary hearing, you were hoping that by talking to Detective [Vander] Lee, that if he would help you out with that case then?" Grady again replied: "No." After a brief digression, appellant asked: "So, Mr. Grady, after you talked with Detective Vander Lee and the other detective, he told you that he would talk to the D.A. about your case, didn't he?" Grady replied: "Not to my knowledge, no." Counsel did not attempt to impeach Grady with the transcript of the preliminary hearing. Instead, she asked him if his probation was modified favorably after he spoke with the detectives. The court understood Grady denied this.

Appellant represented to the court that Grady's sentence had in fact been modified. The court reviewed Grady's file, but it apparently did not show a modification. Appellant expressed a belief that the file was incomplete. The court stated it would take judicial notice of the modified sentence if appellant produced documentary evidence. Appellant later withdrew this request.

11

The court denied the request for judicial notice, explaining: "I'm not going to let you pull up something in the preliminary hearing, if it was missed here in the trial." The court agreed to inform the jury of Grady's initial sentence, more recent arrest for a probation violation, questioning about the events of this case, and subsequent reinstatement of probation on the condition that he serve 120 days in jail.

Assuming for the sake of argument that the trial court erred in deciding this issue in appellant's absence, there is no reasonable possibility appellant would have obtained a more favorable outcome if he had been present. Appellant suggests he may have been able to provide background information on Grady or to supplement counsel's recollection of details of the preliminary hearing if he had been present at the hearing. The trial court's ruling was premised in large part on counsel's failure to impeach Grady during his trial testimony by using a transcript of the preliminary hearing. Appellant's hypothesized additional information would not have impacted that decision.

B.    *Substantial Evidence Supports Appellant's Conviction.*

Appellant contends the evidence shows he acted in lawful self-defense as a matter of law and so there is insufficient evidence to support his conviction for voluntary manslaughter and accompanying firearm enhancement. He further contends that even without considering the law of self-defense, the contradictory testimony by "convicts and drug addicts who testified to secure deals on their own pending criminal cases" is not substantial evidence which can support his conviction.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it

12

contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

" '[C]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*People v. Ennis* (2010) 190 Cal.App.4th 721, 729.) It is well settled that to warrant rejection of testimony that has been believed by the trier of fact, that testimony must be physically impossible or inherently improbable. (See, e.g. *People v. Johnson* (1960) 187 Cal.App.2d 116, 122.) " 'Contradictions and inconsistencies in the testimony of a witness alone will not constitute inherent improbability.' " (*People v. Holman* (1945) 72 Cal.App.2d 75, 90.)

1. Appellant was the shooter.

Appellant contends that there is insufficient evidence to prove he was the shooter because the three eyewitnesses to the shooting were drug addicts and felons; two of them were trying to secure a favorable deal in their own cases and the third admitted he was under the influence of methamphetamine; and the testimony of all three was so contradictory as to be unreliable.

13

The only significant inconsistency in each witness's testimony concerned whether he or she saw appellant shoot Pugh. All three witnesses at one point either stated or testified or both that they saw appellant shoot Pugh. Even when they changed their accounts to say they did not see the actual shooting, their descriptions of the circumstances immediately before and after the shooting supported only one reasonable inference: appellant was the shooter.

It is not unknown for witnesses to contradict earlier statements. (See, e.g., Evid. Code, § 1235.) A witness might well claim not to have seen a crime to avoid becoming involved and then later change his or her mind for a variety of reasons. That does not render the testimony inherently implausible. (See *People v. Holman*, *supra*, 72 Cal.App.2d at p. 90.) It was for the jury to decide the credibility of the witnesses.

The witnesses' life histories do not disqualify them from providing testimony sufficient to uphold a conviction. Nothing in California law bars a convicted felon from testifying; it is the jury's task to evaluate the credibility of such witnesses. Here, there is no direct evidence that the witnesses hoped for or received a deal in exchange for their testimony. Appellant may be correct that the jury could infer from the timing of their statements, which were made after they were taken into custody, that they *hoped* for a deal. This alone would not invalidate their testimony, as long as any actual deal was disclosed and the terms of the deal required them to testify truthfully at trial. Further, because there was no evidence that any witness was promised or received a deal, the jury could reasonably infer that there were other reasons for the timing of their decisions. The witnesses simply may have had time to reflect on the seriousness of the

14

case. They may have been afraid of appellant and felt safer speaking with police in a private interview room where they could not be seen or overheard.

Nothing in California law bars a drug addict from testifying; it is the jury's task to evaluate the credibility of such witnesses. Bird testified methamphetamine did not affect his ability to see or hear, and there is no evidence to the contrary. (*People v. Lewis* (2001) 26 Cal.4th 334, 356–357 [when witness has capacity to perceive and recollect, it is jury's task to determine if witness did in fact perceive and recall events; even "mental defect or insane delusions" do not necessarily show that individual lacked capacity to perceive or recollect].)

### 2. Self-defense

Appellant contends the shooting amounted to self-defense as a matter of law. He is mistaken. Viewing the evidence in the light most favorable to the verdict, appellant and Pugh were about the same height and weight. According to Davis, the only witness to describe Pugh as having a companion, Pugh's companion left before Pugh punched appellant, so the two sides were even in number. There is no evidence Pugh had a gun in his hand before appellant shot him. At best, the presence of a gun under a nearby recreational vehicle might have permitted the jury to infer the gun was Pugh's. Given the lack of any fingerprints or other evidence indicating Pugh's hand touched the gun at any point during the encounter, it would be highly questionable to infer he was drawing the gun when appellant shot him. The mere presence of the gun under the vehicle is not sufficient to establish self-defense as a matter of law.

15

Appellant contends Pugh's punch was so forceful that it constituted great bodily injury, and the law permits self-defense when an individual reasonably believes he will suffer great bodily injury. It was the jury's task to determine both the severity of the blow and whether a reasonable person would believe Pugh was about to inflict another such blow. While there was evidence appellant fell to the ground after being hit, there was also evidence appellant did not fall down, but merely stumbled and caught himself. By all accounts, appellant was able to run from the scene rapidly and without assistance. This would certainly support an inference that Pugh's punch was not forceful enough to inflict great bodily injury.

In his Reply Brief, appellant contends his use of lethal force was authorized to resist Pugh's attempt to rob him. We do not consider issues raised for the first time in a reply brief. We note briefly that the jury was not instructed on this theory of self-defense or on the elements of robbery. The evidence showed Pugh was attempting to collect a debt from appellant. Whether Pugh punched appellant simply out of frustration at appellant's refusal to pay the debt or whether Pugh was illegally attempting to take property from appellant's person by fear or force would have been a question for the jury.

C.    *The Prosecutor Did Not Commit Misconduct.*

Appellant contends the prosecutor's misconduct was so outrageous that it violated his constitutional right to due process. We do not agree.

A prosecutor has a "duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." (*Berger v. United States* (1935) 295 U.S. 78, 88.) A defendant need not prove a

prosecutor acted in bad faith, and it is often more appropriate to characterize the prosecutor's conduct as error rather than misconduct. (*People v. Bolton* (1979) 23 Cal.3d 208, 213–214; see *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

We review a trial court's denial of a claim of prosecutorial error or misconduct under the deferential abuse of discretion standard. (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.) We review any factual findings by the trial court for substantial evidence. (*People v. Uribe* (2011) 199 Cal.App.4th 836, 857.)

### 1. Surveillance video

Appellant contends the prosecutor committed misconduct when he played a portion of surveillance video during closing argument which had not been played at trial, and then commented on it.

A prosecutor may not refer to matters outside the record by arguing matters not in evidence. (*People v. Hill*, *supra*, 17 Cal.4th at pp. 827–828.)

Here, the trial court found that the prosecutor played only the portion of the tape that had, in fact, been played during trial. The record supports this finding. We thus see no abuse of discretion in the trial court's denial of appellant's motion for a mistrial based on prosecutorial misconduct.

Appellant insists that a portion of the video, not played during the trial, was played during closing argument. That portion showed two men getting into a white car and driving away. The record on appeal does not support such a claim. The prosecutor never argued that two men were present. Indeed, the prosecutor stated: "[W]e know that like guilty people, the defendant took off. . . . He took off. And you watched it happen. Here he comes. The guy in the white shirt, dark sweats or dark

17

pants--" Defense counsel objected, but was overruled. The prosecutor continued: "Exactly as the witnesses described. White shirt, dark gray, dark sweats. And there it is at exactly the time of the shooting. 1:29 a.m."

Defense counsel herself described events on the video in the same way: "At 1:28 and 54 seconds, there's a person with a shopping cart that's headed . . . towards the corner of 7th and Ceres. [¶] At 1:28 and 59 seconds, a man runs up around the corner of 7th and Ceres as the shopping cart person is still at that corner, wearing—this man that runs was wearing a white t-shirt, dark pants and appears to be holding his left side of his pants." Thus, her description of the video matches the prosecutor's description during closing argument of one man running. Significantly, the trial court also described the video as showing "someone in [a] white top running by [a] car" and "a figure running" – neither of which is consistent with two men running to a car and getting in it.

Assuming for the sake of argument that the prosecutor somehow mistakenly showed an unplayed portion of the video, the trial court's description of the video shows the error was harmless. The video shows only one person who is not getting into a car. The trial court specifically noted that there was "[n]o ability to identify anything regarding the figure." Thus, appellant could not have been prejudiced by this brief clip, which was remarkably similar to the clip played during trial. This is especially so because during deliberation the jury received only the portion of the video which was played at trial.

2. Comment on closing argument

In rebuttal argument, the prosecutor stated appellant was relying on the prosecutor's failure to offer evidence: "There's

18

nothing about this.  There's nothing about that.  What about this?  What about that?  [¶]  They want forensic testing on the shell casings. . . .  They want [someone from] Facebook to come here and testify.  They want all kinds of other things.  And the question for you isn't that.  The fact of the matter is you're here to decide this case as I charged you at the end of my first argument based on the evidence.  *And what the defense is asking you to do is go back there and make something up.  Make up a story that makes the defendant not guilty.*"  (Italics added.)  After defense counsel objected and was overruled, the prosecutor continued:  "And then that's not what we're here to do.  The question what we do is that the evidence, what has been presented?"

The trial court found this was "invited comment." Appellant contends that the italicized comments amounted to an improper claim that his counsel had fabricated a defense and also a disparagement of counsel.

" 'A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel.' [Citations.]  'In evaluating a claim of such misconduct, we determine whether the prosecutor's comments were a fair response to defense counsel's remarks' [citation], and whether there is a reasonable likelihood the jury construed the remarks in an objectionable fashion."  (*People v. Edwards* (2013) 57 Cal.4th 658, 738.)

It is generally misconduct for a prosecutor to state or imply that defense counsel has fabricated a defense.  (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1337.)  A prosecutor may argue that defense counsel " 'is attempting to confuse the issues and urge[] the jury to focus on what the prosecution believes is the relevant evidence.' "  (*People v. Hillhouse* (2002) 27 Cal.4th 469,

19

502; see *People v. Marquez* (1992) 1 Cal.4th 553, 575–576 [finding proper prosecutor's argument that a " 'smokescreen' " had been " 'laid down [by the defense] to hide the truth' "].)

Here, it is reasonably likely that the jury understood the prosecutor's remarks as the court did, as a response to statements defense counsel made at the end of her closing argument. Defense counsel argued that "it seems as though the prosecutor here . . . was listening to a different trial.  Just as those three witnesses, it appears that they were looking at a different event."  The prosecutor's remarks, in effect, argued that it was defense counsel who was listening to a different trial.

Considering the remarks in context further demonstrates that the remarks are a comment on defense counsel's interpretation of the evidence, which expressly invited the jury to draw inferences.  In the prosecutor's view, such inferences were without evidentiary support from the record or were based on the absence of evidence in the record.  The prosecutor was urging the jury to decide the case on the evidence presented.

This was not an abstract argument by the prosecutor.  Both before and after the complained-of remarks, the prosecutor specifically explained why he believed the inferences he wanted the jury to draw were, without more, supported by the evidence. In addition to the Facebook and shell casings arguments referenced above, the prosecutor addressed the cause of death, the gun found at the scene, and the detectives' efforts to speak to witnesses at the scene.

These were indeed areas where defense counsel had invited the jury to draw unsupported inferences.  She argued that police found four 9 mm shell casings, but "the prosecution didn't put on any evidence whatsoever to show that all four of those casings came from the same gun. . . .  [So] we don't know about the other

20

guns."[6]  She speculated more overtly about a woman at the scene: "I don't know, we don't have any evidence of it, but just maybe that was Carmen. . . .  Not a word from these detectives about seeking out that woman."  Defense counsel also argued:  "I think it's reasonable to assume that [Pugh] had a gun in his hand, too, and the gun was under that camper.  But whoever it was that shot him, beat him to the draw."  Eyewitnesses, of course, did not see a gun in Pugh's hand.[7]

Defense counsel also suggested the jury could infer a different cause of death than the one determined by the coroner, arguing that the coroner "said that the wounds he examined were well-healed. . . .  We don't have any evidence from the prosecution whatsoever as to when they became well-healed.  So how did he die?"  The coroner was clear that the bullet caused the brain to bleed as it passed through the brain, and the body's response to that bleeding caused significant permanent damage to Pugh's brain which required skilled nursing and a feeding tube.

---

[6]      Numerous shell casings of the same caliber cannot, without more, support an inference that multiple guns were fired.  The witnesses agreed that Pugh's companion left before shots were fired, and that appellant fired multiple shots after that.  The only gun found at the scene was a .38 caliber handgun.  Unless appellant had and fired two guns, something no witness reported, there could have been no "other guns" at the scene.

[7]      Even assuming it would be reasonable to infer that the gun found under the camper belonged to Pugh, there was no basis to infer that the gun was ever in his hand (as opposed to, for example, falling out of his pocket or waistband after he was wounded), let alone that it was in his hand when appellant began firing.

21

3.    <u>DNA evidence</u>

Appellant contends the trial court abused its discretion in overruling his objection that the italicized portion of the following remark by the prosecutor constituted impermissible burden shifting:  "Even though . . . the evidence is the detectives and the Los Angeles [Police] Department went [to] tremendous length to figure out what this gun was all about.  They took that gun and they fingerprinted it.  No.  They took that gun and they split the DNA, and now I have the burden of proof.  But don't get me wrong.  *If there was anything in that gun that connected it to Ronald Pugh, you can bet the defense would be jumping up and down with joy . . . .*"  (Italics added.)  The trial court found the remarks were "just part of the evidence."

The trial court was well within its discretion in ruling that the remarks were simply a comment on the state of the evidence. It is well settled that a prosecutor may comment "on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses."  (*People v. Brady* (2010) 50 Cal.4th 547, 566.)  Similarly, the prosecutor may criticize defense theories based on the evidence.  (*People v. Bemore* (2000) 22 Cal.4th 809, 846.)  Defense counsel had urged the jury to infer that Pugh had the gun in his hand at the time of the shooting.  It was thus permissible for the prosecutor in this case to argue that appellant had not pointed to any evidence linking the gun to Pugh, and to specifically argue that appellant had access to DNA from the .38 caliber gun and if appellant had evidence that Pugh's DNA was on the gun, he would have introduced it at trial. This is particularly true since at the same time the prosecutor pointed out that the People had introduced evidence negating a

22

link between Pugh and the gun, specifically evidence that there were no fingerprints on the gun.

Appellant contends a note from the jury during deliberations shows the prosecutor's argument confused the jury about what DNA testing revealed about the gun. The note clearly states the jury is confused about whether a defense objection to Detective Vander Lee's testimony about turning over DNA to the defense was overruled or sustained. This does not show confusion about the results of any DNA testing.

D.    *The Section 667.5 Enhancements Must Be Stricken.*

Appellant contends, and respondent agrees, that the eight 1-year enhancements for appellant's prior prison terms, imposed pursuant to section 667.5, subdivision (b), must be stricken. They agree that remand for resentencing is not required. We agree as well.

Senate Bill No. 136 became effective on January 1, 2020 and now permits a court to impose an enhancement pursuant to section 667.5, subdivision (b) only if the defendant had served a prison term for a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b). This change applies to judgments on appeal which were not yet final at the time of the change. (See, e.g., *People v. Winn* (2020) 44 Cal.App.5th 859, 872–873.)

Appellant's prior convictions are for transportation or sale of narcotics and possession of a firearm by a felon, which are not included in the listed felonies in Welfare and Institutions Code section 6600, subdivision (b). Accordingly, we order the enhancements stricken. Because the trial court imposed the maximum sentence permitted at the time, there is no need to remand for resentencing.

23

E.   *Appellant Has Forfeited His Fines and Fees Claim.*

Appellant contends the trial court's imposition of a $30 court facilities assessment (Gov. Code, § 70373), a $40 court operations assessment (§ 1465.8), and a $300 restitution fine (§ 1202.4) and the accompanying suspended parole revocation fine without a finding that he had the ability to pay those amounts was a violation of his constitutional rights as set forth in *People v. Dueñas* (2019) 30 Cal.App.5th 1157.)[8]  Appellant acknowledges that he failed to object to the imposition of these fines and fees in the trial court.

We agree with *People v. Frandsen* (2019) 33 Cal.App.5th 1126, which finds forfeiture.  (*Id.* at pp. 1153–1155; accord, *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1032–1033; *People v. Bipialaka* (2019) 34 Cal.App.5th 455, 464; see also *People v. Avila* (2009) 46 Cal.4th 680, 729 [finding forfeiture where the defendant failed to object to imposition of restitution fine under former § 1202.4 based on inability to pay].) We believe *Frandsen* is better reasoned than the non-forfeiture cases of *People v. Castellano* (2019) 33 Cal.App.5th 485 and *People v. Jones* (2019) 36 Cal.App.5th 1028, upon which appellant relies.

---

[8]   The California Supreme Court has granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844, on the issue of whether a trial court must "consider a defendant's ability to pay before imposing or executing fines, fees, and assessments" and if so, "which party bears the burden of proof regarding defendant's ability to pay."

## DISPOSITION

Appellant's eight 1-year enhancement terms imposed pursuant to section 667.5 are ordered stricken and appellant's total sentence is reduced to 21 years. The clerk of the superior court is instructed to prepare an amended abstract of conviction reflecting these changes and to forward a copy to the Department of Corrections and Rehabilitation. The judgment of conviction is affirmed in all other respects.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, J.

We concur:

BIGELOW, P. J.

WILEY, J.