Filed 10/31/22 Giambastiani v. Gordon CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| DEBRA KAY GIAMBASTIANI,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>STEVE GORDON, DIRECTOR OF THE DEPARTMENT OF MOTOR VEHICLES,<br><br>    Defendant and Respondent. | A163616<br><br>(Sonoma County<br>Super. Ct. No. SCV267137) |

A neighbor of appellant Debra Giambastiani observed her crash her car into her garage and stumble around as though under the influence of alcohol, and called the police. An officer responded to the call, observed fresh collision damage to Giambastiani's car and garage, and knocked on the door, which Giambastiani answered while appearing visibly intoxicated. When Giambastiani went to retrieve her identification, the officer stepped into her home and subsequently arrested her for driving under the influence, an arrest that led the Department of Motor Vehicles (DMV) to suspend her driver's license for one year. Giambastiani unsuccessfully sought a writ of administrative mandamus challenging the DMV's decision, arguing that the officer violated the Fourth Amendment in knocking repeatedly on her door and in entering her home without a warrant. We affirm.

1

# BACKGROUND

On March 24, 2018, at approximately 7:29 p.m., Officer Timothy Gooler of the Santa Rosa Police Department was dispatched to Giambastiani's address based on the report of an anonymous caller who "witnessed his neighbor pull into her driveway and 'smash the car into the house.' "[1] The caller identified Giambastiani by name and description, and described the vehicle as a silver Ford Escape. The caller also indicated that he believed Giambastiani had been drinking as she was "stumbling around the vehicle." According to Officer Gooler's incident report, the following took place when he arrived on the scene:

"I arrived several minutes after the dispatch and observed a silver Ford Escape in the driveway, which matched the description of the involved vehicle. Several feet away, I observed fresh collision damage to the southwest corner of the garage. The siding and framing appeared to be 'smashed' in, consistent with having been struck by a vehicle. I additionally observed moderate collision damage and matching paint transfer on the front right bumper of the Escape. It was apparent that the Ford Escape had recently been involved in a collision with the house.

"I touched the hood of the Escape and felt that it was very warm to the touch. The Escape was still making 'crackling' noises as the metal cooled, which indicated to me that it had recently been driven.

---

[1] Officer Gooler later interviewed the anonymous caller, who indicated that he was a neighbor who lived near Giambastiani, and "knew exactly who was driving and that it was 'Debra,' who he knew to be his neighbor and was a real estate agent."

"Considering the collision with the residence, I felt obligated to check the welfare of the driver and investigate the possible DUI collision. While it was possible the driver was intoxicated or impaired, I felt it was also possible the driver had suffered a medical emergency such as diabetic shock (which has similar effects as extreme intoxication and can be life threatening).

"I walked up the walkway from the driveway to the publicly accessible front door of the residence, and knocked upon the door. The front door contained several small windows across the top, which allowed a clear view inside the residence. I watched as a white female with blonde hair wearing black clothing walked across the hallway, glancing in my direction as I knocked and ignoring me. I noted that the female matched the description of the driver, provided by the reporting party.

"I knocked two more times and was greeted by the same female, later identified as (OF) Debra Giambastiani. Giambastiani opened the door and I noticed she had apparently changed clothing, and was now wearing a bath robe.

"I advised Giambastiani I had been called to check on her after she crashed into her house. Giambastiani denied having crashed, and told me she had gotten home 'twenty minutes ago.'

"Almost immediately I noticed objective signs of extremely heavy alcohol intoxication emitting from Giambastiani's person. Giambastiani could barely stand and was leaning on a wall and the door for support. Giambastiani spoke with such slurred speech she was difficult at times to understand, a heavy odor of alcoholic beverage was emitting from within the residence and her person, and her eyes appeared red and watery. I asked Giambastiani how much alcohol she had consumed, and she replied 'I don't

know.' Giambastiani told me that she drank at home, and then told me she no longer wanted to answer my questions. Giambastiani asked me what I wanted to know, and I told her that I was concerned about her driving drunk. Giambastiani responded by telling me that I was 'crazy' and that I was 'wrong.'

"I asked Giambastiani for her ID, at which point she told me she had it and began walking inside. Giambastiani left the front door wide open as she walked inside, made no attempt to close it, and at no time indicated that I wasn't welcome inside. In fact, it appeared by the way she left her door open that she was inviting me inside. For my safety with concern that Giambastiani may return with a weapon, I followed Giambastiani inside briefly. I only took several steps inside to a hallway to watch her for officer safety concerns. Giambastiani turned around and told me that she did not want me in her residence, and I told her that was fine, I asked Giambastiani to step outside with me to discuss this further. She told me no. Once again, I asked Giambastiani to please throw on some clothing and step outside to speak with me. Giambastiani said 'I don't know what's going on. What is crazy.'

"I looked to the doorway intending to step outside and honor Giambastiani's request to leave, at which point I noticed the doorway was blocked by an unknown male I had never seen. I asked the male who he was, and Giambastiani spoke over him and told me that he was her husband (later identified as (IO) Patrick Reis). At this point, Reis was blocking my exit to the residence.

"I told Giambastiani that she was involved in a collision and she was obviously drunk, and that I wanted her to step outside for field sobriety tests. Giambastiani responded 'I'm not involved in a collision. No, I'm not going to

4

go out of my house. I'm not going to do what you say. I'm not going to do what you said. Because I didn't do anything what you said wrong.' The entire time, Reis was blocking the front door and arguing that my case was 'circumstantial' and that I couldn't prove when Giambastiani had consumed alcohol or driven.

"I asked Giambastiani if she would let me look at her eyes or if she would do 'anything' (referring to FST's), and she responded no. I asked if she'd like to blow into a machine to prove her sobriety, and she told me she would not.

"Based upon Giambastiani's objective alcohol signs, the fact that she had been involved in a collision with her residence and the fact that she was witnessed driving by a neighbor, I placed her under arrest for [Vehicle Code section] 23152 [subd.] (a)[2] [] pursuant to [Vehicle Code section] 40300.5 []. As I placed handcuffs on her, she tensed up and pulled away. I told her not to fight with the police, and used a control hold to prevent her from assaulting her."

After a further struggle, Officer Gooler placed Giambastiani in his patrol vehicle:

"Once I got into my patrol vehicle, I began speaking with Giambastiani and advised her of Implied Consent and [*California v.*] *Trombetta* [(1984) 467 U.S. 479]. I advised Giambastiani that she had the right to refuse a chemical test, but that it will result in a one-year license suspension. When I told her this, Giambastiani replied 'I don't care!' I asked her 'you don't care if your license is suspended?' and she affirmed her previous statement. It was

---

[2] "It is unlawful for a person who is under the influence of any alcoholic beverage to drive a vehicle."

clear that Giambastiani was not going to consent to a chemical test, and I began transporting her to SRPD to author a blood draw warrant."

Officer Gooler obtained a search warrant for a blood draw and a blood sample was obtained from Giambastiani.

Based on her refusal to submit to a chemical test, Giambastiani's driver's license was suspended for one year pursuant to Vehicle Code[3] section 13353.[4]

An administrative hearing was held on the suspension on August 24, 2020. At the hearing, the DMV introduced several exhibits, including Officer Gooler's 10-page incident report quoted above.

The DMV hearing officer found that Officer Gooler had reasonable cause to believe Giambastiani was driving under the influence in violation of the Vehicle Code based on the "objective signs of intoxication" as well as his other observations of the damaged garage and vehicle, that Giambastiani was "lawfully arrested for a violation of Vehicle Code Section 23152, 23153 or 23140," that the required admonition was proper despite the statement on the admonition form that it was given after the blood draw, and that Giambastiani had refused the admonition. As a result of these findings, the DMV imposed a one-year suspension of Giambastiani's driving privileges. A written "Notification of Findings and Decision" followed on September 10.

_____

[3] Further undesignated statutory references are to the Vehicle Code.

[4] "(a) If a person refuses the officer's request to submit to, or fails to complete, a chemical test or tests pursuant to Section 23612, upon receipt of the officer's sworn statement that the officer had reasonable cause to believe the person had been driving a motor vehicle in violation of Section 23140, 23152, or 23153, and that the person had refused to submit to, or did not complete, the test or tests after being requested by the officer, the department shall do one of the following: [¶] (1) Suspend the person's privilege to operate a motor vehicle for a period of one year."

6

On September 25, Giambastiani filed a petition for writ of administrative mandamus in Sonoma County Superior Court, seeking reversal of the DMV order suspending her license. She argued that Officer Gooler's warrantless entry of her home was not justified by implied consent or exigent circumstances; that Officer Gooler unlawfully intruded on the "curtilage" of her property when he examined her vehicle and the garage in her driveway; that he violated the Fourth Amendment when he repeatedly knocked on her door; that he did so again when he continued interrogating her after she stated that she did not want to answer his questions; that the evidence seized was "tainted" by his violations of the Fourth Amendment; and that his unsworn police report was inadmissible to supplement the admonition form.

On May 5, 2021, after a hearing, the trial court denied the writ petition in a lengthy written order. The trial court concluded that Gooler's examination of Giambastiani's car and garage was lawful, that Officer Gooler had probable cause to arrest Giambastiani for driving under the influence, that Officer Gooler's entry into the home was justified by implied consent although there were no exigent circumstances, and that Gooler's incident report was admissible to explain the timing of the admonition.

Giambastiani filed a notice of appeal.

## DISCUSSION

Giambastiani renews two of her arguments below on appeal: (1) that Officer Gooler violated the Fourth Amendment by continuing to knock at her door after she ignored his first knock; and (2) that the trial court erred in finding that she gave implied consent for Officer Gooler to enter her home.

7

**Applicable Law and Standard of Review**

The implied consent law provides that motorists who are arrested on suspicion of DUI are deemed to have consented to chemical testing to determine their blood-alcohol concentration. (§ 23612, subd. (a)(1)(A); *Troppman v. Valverde* (2007) 40 Cal.4th 1121, 1129–1131.) If a motorist who is arrested for DUI refuses to submit to a chemical test or fails to complete one, the arresting officer must personally serve the motorist with notice of an order of suspension or revocation of the motorist's privilege to operate a motor vehicle and issue the motorist a 30-day temporary driver's license. (§§ 13353, subd. (c), 23612, subds. (e), (f).) The officer must take possession of the motorist's driver's license and immediately forward to the DMV a copy of the completed notice of suspension or revocation and the driver's license taken from the motorist. (§ 23612, subds. (f), (g)(1).) Upon receipt of the notice of suspension or revocation and the officer's sworn statement that the officer had reasonable cause to believe the motorist drove under the influence of alcohol in violation of section 23152 or 23153, the DMV shall suspend the motorist's driver's license for a one-year period. (§ 13353, subd. (a)(1).)

Also upon receipt of the officer's sworn statement, the DMV "shall review the record." (§ 13353, subd. (d).) This review considers whether the following facts are true: "(1) Whether the peace officer had reasonable cause to believe the person had been driving a motor vehicle in violation of Section 23140, 23152, or 23153," "(2) Whether the person was placed under arrest," "(3) Whether the person refused to submit to, or did not complete, the test or tests after being requested by a peace officer" and "(4) Whether, except for a person described in subdivision (a) of Section 23612 who is incapable of refusing, the person had been told that his or her driving privilege would be suspended or revoked if he or she refused to submit to, or did not complete,

8

the test or tests." (§ 13353, subd. (d), see § 13557, subds. (a), (b)(1).) If the DMV finds each of these facts to be true by a preponderance of the evidence, it shall sustain the license suspension or revocation. (§ 13557, subd. (b)(1).)

The DMV's decision to uphold a driver's license suspension is subject to judicial review by administrative mandamus. (Code Civ. Proc., § 1094.5; § 13559, subd. (a).) " 'In ruling on an application for a writ of mandate following an order of suspension or revocation, a trial court is required to determine, based on its independent judgment, " 'whether the weight of the evidence supported the administrative decision.' " ' (*Lake* [*v. Reed* (1997)] 16 Cal.4th [448,] 456.)" (*Coffey v. Shiomoto* (2015) 60 Cal.4th 1198, 1217.)

On appeal, we review the record to determine whether the trial court's findings are supported by substantial evidence, resolving all evidentiary conflicts and drawing all legitimate and reasonable inferences in favor of the trial court's decision. (*Coffey v. Shiomoto, supra*, 60 Cal.4th at p. 1217; *Lake v. Reed, supra*, 16 Cal.4th at p. 457.) We exercise de novo review, however, of the trial court's legal determinations based on undisputed facts. (*Isaac v. Department of Motor Vehicles* (2007) 155 Cal.App.4th 851, 856.)

Our review, like that of the trial court, is ordinarily confined to the administrative record, that is, only those materials produced during the administrative proceeding conducted by the DMV. (See § 13559, subd. (a) ["The review shall be on the record of the hearing and the court shall not consider other evidence"]; *City of Hesperia v. Lake Arrowhead Community Services District* (2019) 37 Cal.App.5th 734, 766; *Garcia v. Department of Motor Vehicles* (2010) 185 Cal.App.4th 73, 82.)

**Applicability of Exclusionary Rule to DMV Administrative Proceedings**

As noted, the parties have briefed two Fourth Amendment questions on appeal, namely (1) whether Officer Gooler violated the Fourth Amendment by

continuing to knock on Giambastiani's door after she saw him through the door and ignored him, and (2) whether Officer Gooler's warrantless entry into Giambastiani's home, which ultimately resulted in her being placed under arrest, was excused by the implied consent exception to the warrant requirement, both parties' briefing relying exclusively on criminal cases applying the exclusionary rule. Giambastiani has not cited any case holding that evidence should have been excluded in a DMV administrative review of a license suspension as a remedy for a violation of the Fourth Amendment. And it is not clear that the exclusionary rule applies in this context. At least one Court of Appeal has considered the question and concluded that it does not. (See *Park v. Valverde* (2007) 152 Cal.App.4th 877, 882–903; 4 Witkin, Cal. Criminal Law (4th ed. 2022) Administrative Proceedings, § 27.) And in *Gikas v. Zolin* (1993) 6 Cal.4th 841, our Supreme Court held that the dismissal of criminal DUI charges based on a finding that the underlying traffic stop and detention were unlawful did not collaterally estop the DMV from relitigating that issue in an administrative proceeding (*id*. at pp. 848–852), and that suppression of evidence in a criminal proceeding under Penal Code section 1538.5, subdivision (d) does not make that same evidence inadmissible in a DMV administrative proceeding (*Gikas v. Zolin*, *supra*, 6 Cal.4th at pp. 857–859).

We need not reach this issue, however, because we conclude, with respect to Giambastiani's first argument, that there was no violation of the Fourth Amendment, and with respect to her second argument, that even assuming a violation and the applicability of the exclusionary rule, there is no evidence to suppress.

**Officer Gooler Did Not Violate the Fourth Amendment By Knocking Repeatedly on Giambastiani's Door**

Giambastiani's first argument is that Officer Gooler violated the Fourth Amendment by remaining on her porch and continuing to knock after she ignored his first knock, relying on *Florida v. Jardines* (2013) 569 U.S. 1 (*Jardines*).

In *Jardines*, the police received a tip that marijuana was being grown in the defendant's house, and they then brought a drug-sniffing dog onto the defendant's porch, who indicated the presence of narcotics. (*Jardines, supra*, 569 U.S. at pp. 3–4.) The police obtained a search warrant, the search revealed marijuana plants, and the defendant moved to suppress. (*Id.* at pp. 4–5.) The Supreme Court held that the Fourth Amendment had been violated because the canine search had exceeded the scope of implied license to approach the defendant's home and knock on the door:

"We have accordingly recognized that 'the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds.' [Citation.] This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.' [Citation.]

"But introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do *that*. An invitation to engage in canine

11

forensic investigation assuredly does not inhere in the very act of hanging a knocker." (*Jardines*, *supra*, 569 U.S. at p. 8, fn. omitted.)

*Jardines* is easily distinguishable. Here there was no canine forensic investigation, or other search of any kind. Gooler simply " 'approach[ed the] home and knock[ed], precisely [as] any private citizen might do.' " (*Jardines*, *supra*, 569 U.S. at p. 8.) Gooler was within his implied license to knock more than once, even after being seen by Giambastiani, on the assumption that she would eventually open the door or that knocking again might persuade her to do so. Indeed, that is exactly what she did.

Giambastiani's reliance on *United States v. Lundin* (9th Cir. 2016) 817 F.3d 1151 is similarly misplaced. In that case, police officers knocked on the defendant's door at 4:00 a.m. for the express purpose of placing him under arrest. (*Id.* at p. 1156.) Because the visit was not during "waking hours," and because the officers' express purpose was to place the defendant under arrest, the Ninth Circuit concluded that the officers had exceeded the bounds of their implied "knock and talk" license under *Jardines*. (*Id.* at pp. 1159–1160.) Not so here, where Officer Gooler knocked on Giambastiani's door in the evening for the purpose of checking on her welfare and investigating an accident that had evidently taken place in her driveway. (See *id.* at p. 1160 ["An officer does not violate the Fourth Amendment by approaching a home at a reasonable hour and knocking on the front door with the intent merely to ask the resident questions, even if the officer has probable cause to arrest the resident"].)

In short, Officer Gooler did not exceed the bounds of his implied license under the Fourth Amendment by knocking multiple times on Giambastiani's door.

**Officer Gooler's Warrantless Entry Does Not Require Suppression of Any Evidence**

Giambastiani's other argument is that the finding that she gave Officer Gooler implied consent to enter her home is not supported by substantial evidence. She further argues that because Gooler entered her home without a warrant and without her express or implied consent, the exclusionary rule "requires the suppression of any evidence Gooler seized from that point forward," "including everything he saw or heard in [Giambastiani]'s home and after she was driven to jail."

The parties' briefs focus on the question of whether Officer Gooler had Giambastiani's implied consent to enter her home.[5] However, even assuming a lack of implied consent, we conclude that substantial evidence nevertheless supports Giambastiani's license suspension.

To explain why, *People v. Marquez* (1992) 1 Cal.4th 553 (*Marquez*) is instructive. In that case, the defendant, Gonzalo Marquez, had been arrested in his home pursuant to a warrant that related to a *different* Gonzalo Marquez. (*Id.* at p. 568.) Our Supreme Court rejected the argument that the exclusionary rule required suppression of his subsequent confession at the police station as the product of his arrest with an invalid warrant:

"[T]he police in this case had probable cause to arrest defendant independent of the arrest warrant. The arrest warrant served only to legitimate the arrest of defendant in his residence. The United States

---

[5] The parties' briefs focus on four implied consent cases: *People v. Martino* (1985) 166 Cal.App.3d 777, *People v. Guyette* (1964) 231 Cal.App.2d 460, *People v. Cove* (1964) 228 Cal.App.2d 466, and *People v. Harrington* (1970) 2 Cal.3d 991. In addition, we granted Giambastiani's motion to file a supplemental brief discussing *United States v. Gray* (D. Kan. 1999) 71 F.Supp.2d 1081. But because we resolve this case on grounds not involving implied consent, we need not address the parties' arguments about these cases.

Supreme Court considered a similar situation in *New York v. Harris* (1990) 495 U.S. 14, where police, without a warrant but with probable cause, arrested Harris in his apartment. The court noted that the purpose of the warrant requirement for an arrest in the home is to protect the home. Thus anything incriminating that the police gathered from arresting Harris in his home, rather than elsewhere, must be suppressed. The court refused to require suppression of statements made at the police station, explaining: 'Nothing in the reasoning of that case [*Payton v. New York* [(1980)] 445 U.S. 573] suggests that an arrest in a home without a warrant but with probable cause somehow renders unlawful continued custody of the suspect once he is removed from the house. There could be no valid claim here that Harris was immune from prosecution because his person was the fruit of an illegal arrest. [Citation.] Nor is there any claim that the warrantless arrest required the police to release Harris or that Harris could not be immediately rearrested if momentarily released. Because the officers had probable cause to arrest Harris for a crime, Harris was not unlawfully in custody when he was removed to the station house, given *Miranda*[ *v. Arizona* (1966) 384 U.S. 436] warnings and allowed to talk. For Fourth Amendment purposes, the legal issue is the same as it would be had the police arrested Harris on his door step, illegally entered his home to search for evidence, and later interrogated Harris at the station house. Similarly, if the police had made a warrantless entry into Harris's home, not found him there, but arrested him on the street when he returned, a later statement made by him after proper warnings would no doubt be admissible.' (*Id.* at p. 18.) [¶] . . . [¶]

"Accordingly, we conclude that the lack of an arrest warrant does not invalidate defendant's arrest or require suppression of statements he made at the police station. It would require suppression solely of evidence obtained

14

from searching the home at the time of the arrest." (*Marquez, supra,* 1 Cal.4th at pp. 568–569; see *People v. Watkins* (1994) 26 Cal.App.4th 19, 29 ["Where there is probable cause to arrest, the fact that police illegally enter a home to make a warrantless arrest neither invalidates the arrest itself nor requires suppression of any post arrest statements the defendant makes at the police station"].)

In this case, Officer Gooler had ample reasonable cause to believe that Giambastiani had driven under the influence before and independent of his warrantless entry into her home. Giambastiani's neighbor had identified her by name and address, described her vehicle as a silver Ford Escape, and indicated that she had "pulled into her driveway and 'smash[ed] the car into the house,' " and was "stumbling around the vehicle." Upon arriving at the scene, Officer Gooler found a silver Ford Escape in the driveway, "very warm to the touch" and making "crackling" noises indicating it had just been driven. He also observed "fresh collision damage" to the corner of the garage, and "moderate collision damage and matching paint transfer on the right front bumper of the Escape." And when Giambastiani came to the door, Officer Gooler "noticed objective signs of extremely heavy alcohol intoxication," observing that she "could barely stand and was leaning on a wall and the door for support," "spoke with . . . slurred speech" and "was difficult at times to understand" with "a heavy odor of alcoholic beverage . . . emitting from within the residence and her person" and eyes that "appeared red and watery." Giambastiani has not identified any further evidence that was collected once Officer Gooler entered the home. Although Officer Gooler initially placed Giambastiani under arrest inside her home, she ultimately refused the breath test outside in his patrol vehicle. In short, even assuming any evidence seized after Officer Gooler entered Giambastiani's home must

be suppressed, the finding that Gooler had reasonable cause to believe she had driven her vehicle under the influence would not be affected.

## DISPOSITION

The judgment is affirmed. Respondent is to recover its costs on appeal.

_____
Richman, Acting P. J.

We concur:


_____
Stewart, J.


_____
Mayfield, J. *


*Giambastiani v. Gordon* (A163616)

      *Judge of the Mendocino Superior Court, Judge Cindee Mayfield, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.